Slip Op. 07-131

UNITED STATES COURT OF INTERNATIONAL TRADE

```
                                    :
TIANJIN MACHINERY IMPORT &          :
EXPORT CORP. and SHANDONG           :
HUARONG MACHINERY CO., LTD.,        :
                                    :
           Plaintiffs,              :
                                    : Before: Richard K. Eaton, Judge
      v.                            :
                                    : Court No. 05-00522
UNITED STATES,                      :
                                    : Public Version
           Defendant,              :
                                    :
      and                           :
                                    :
AMES TRUE TEMPER,                   :
                                    :
           Deft.-Int.               :
                                    :
```

OPINION AND ORDER

[United States Department of Commerce's final results of the thirteenth administrative review of the antidumping duty order covering imports into the United States of heavy forged hand tools from the People's Republic of China are sustained in part and remanded.]

Dated: August 28, 2007

*Hume & Associates, PC* (*Robert T. Hume*), for plaintiffs.

*Peter D. Keisler*, Assistant Attorney General; *Jeanne E. Davidson*, Director, Civil Division, Commercial Litigation Branch, United States Department of Justice; *Patricia M. McCarthy*, Assistant Director, Civil Division, Commercial Litigation Branch, United States Department of Justice (*Stephen C. Tosini*); Office of Chief Counsel for Import Administration, United States Department of Commerce (*Scott McBride*), of counsel, for defendant.

*Wiley Rein, LLP* (*Timothy C. Brightbill* and *Charles O. Verrill, Jr.*), for defendant-intervenor.

Eaton, Judge: This matter is before the court on the USCIT
Rule 56.2 motion for judgment upon the agency record of
plaintiffs Tianjin Machinery Import & Export Corp. ("TMC") and
Shandong Huarong Machinery Co., Ltd. ("Huarong").  By their
motion, plaintiffs challenge certain aspects of the United States
Department of Commerce's ("Commerce" or the "Department") final
results of its thirteenth administrative review of the four
antidumping duty orders applicable to imports into the United
States of heavy forged hand tools ("HFHTs") from the People's
Republic of China ("PRC").  *See* HFHTs, Finished or Unfinished,
With or Without Handles, From the PRC, 70 Fed. Reg. 54,897 (Dep't
of Commerce Sept. 19, 2005) (final) ("Final Results"); *see also*
HFHTs, Finished or Unfinished, With or Without Handles From the
PRC, 56 Fed. Reg. 6622 (Dep't of Commerce Feb. 19, 1991) (notice)
("HFHTs Orders").

Jurisdiction is had pursuant to 28 U.S.C. § 1581(c) (2000)
and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2000).  For the following
reasons, Commerce's Final Results are sustained in part and
remanded.


BACKGROUND

Plaintiffs are producers and exporters of HFHTs in the PRC.
Their exports to the United States are subject to the HFHTs
Orders covering axes/adzes, bars/wedges, hammers/sledges and

picks/mattocks.  On February 27, 2004, plaintiffs (and defendant-
intervenor) asked Commerce to conduct an administrative review of
the HFHTs Orders, the thirteenth such review, for the period of
review February 1, 2003, to January 31, 2004 ("POR").  *See* HFHTs,
Finished or Unfinished, With or Without Handles, From the PRC, 70
Fed. Reg. 11,934, 11,935, 11,937 (Dep't of Commerce Mar. 10,
2005) (prelim.) ("Preliminary Results").

The Department initiated its review on March 26, 2004, and
published the Preliminary Results on March 10, 2005.  Commerce
determined preliminarily that plaintiffs sold HFHTs at less than
normal value and further found appropriate the use of facts
otherwise available and adverse facts available ("AFA") pursuant
to 19 U.S.C. § 1677e(a), (b).  *See id.* at 11,934-35.  In the
Final Results, Commerce confirmed its preliminary findings.  *See*
Final Results, 70 Fed. Reg. at 54,898.  Accordingly, the
Department assigned plaintiffs the following rates: Huarong's and
TMC's sales of axes/adzes — 174.58 percent; Huarong's and TMC's
sales of bars/wedges — 139.31 percent; TMC's sales of
hammers/sledges — 45.42 percent; and TMC's sales of
picks/mattocks — 98.77 percent.  *See id.* at 54,899.

Before the court, plaintiffs raise two primary objections to
the Department's conclusions in the Final Results and seek a
remand of this case.  First, plaintiffs insist that Commerce was
not justified in its use of AFA.  Second, in the event the court

Court No. 05-00522                                                    Page   4

finds warranted the use of AFA, plaintiffs urge that Commerce

failed to support with substantial evidence its determination of

the AFA rates.  *See* Pls.' Mot. J. Agency R.("Pls.' Mem.") 7-8.[1]


                        STANDARD OF REVIEW

     When reviewing a final antidumping determination from

Commerce, the court "shall hold unlawful any determination,

finding, or conclusion found . . . to be unsupported by

substantial evidence on the record, or otherwise not in

accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

"Substantial evidence is 'such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion.'"  *Huaiyin

Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374

(Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S.

---

     [1]     In addition, plaintiffs contend that Commerce
erroneously included within the scope of the HFHTs Orders their
exports of the multi-use tough tool ("MUTT") and thereby
calculated incorrectly the AFA rate for axes/adzes.  *See* Pls.'
Mem. 8.  The court, however, has since sustained Commerce's
inclusion of the MUTT within the scope of the order applicable to
axes, adzes and similar hewing tools.  *See Olympia Indus., Inc.
v. United States*, 30 CIT __, __, Slip Op. 06-110 at 2-3 (July 24,
2006) (not reported in the Federal Supplement) ("Because the
MUTT's utility as a tool comes from its steel head with a sharp
blade that can be used for cutting and chopping, the court finds
that it is a hewing tool similar to an axe or adze and, thus,
sustains Commerce's Final Scope Ruling.").  The 60-day period for
appealing that decision has come and gone without an appeal
having been filed.  *See* Fed. R. App. P. 4(a)(1)(B) ("When the
United States or its officer or agency is a party, the notice of
appeal may be filed by any party within 60 days after the
judgment or order appealed from is entered.").

Court No. 05-00522                                              Page  5

197, 229 (1938)).  The court determines the existence of

substantial evidence "by considering the record as a whole,

including evidence that supports as well as evidence that 'fairly

detracts from the substantiality of the evidence.'"  *Id.* (quoting

*Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir.

1984)).


                            DISCUSSION

I.    The Department's Use of AFA

      A.    Application of AFA to "Agent" Sales

      Where a respondent in an administrative review

"significantly impedes" a Commerce proceeding, the agency is

permitted to "fill[] gaps in the record" using facts otherwise

available.  *See* Statement of Administrative Action, Uruguay Round

Agreements Act, accompanying H.R. Rep. No. 103-316, 656, 830-31

(1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4199; *see also* 19

U.S.C. § 1677e(a)(2)(C).  Here, Commerce states that it used

facts available "because Huarong and TMC . . . significantly

impeded the instant proceeding."  Issues & Decision Mem. for the

13th Admin. Rev. of HFHTs from the PRC (Dep't of Commerce Sept.

6, 2005) ("Issues & Dec. Mem.") at 5.  Specifically, the

Department claims that the "use of the 'agent' sales schemes by

[plaintiffs] impeded [its] ability to complete this

administrative review . . ., impose antidumping duties and issue

instructions to [U.S. Customs and Border Protection ("Customs")]

to assess the correct antidumping duties . . . ."  *Id.* at 6

(citations omitted).  In addition, Commerce decided to use AFA

because, in its view, each company failed to cooperate to the

best of its ability by not disclosing the true nature of the

agency relationship, i.e., that TMC was merely a vehicle by which

Huarong could export its goods to the United States at a lower

rate.  *See* Def.'s Resp. Pls.' Mot. J. Admin. R. ("Def.'s Resp.")

8.  In reaching its conclusion, Commerce found that the

companies' relationship was such that TMC did nothing more than

forward its blank invoices to Huarong, thus enabling Huarong to

benefit from TMC's lower dumping margin when making sales to the

United States.

The relevant section of the antidumping duty statute, 19

U.S.C. § 1677e, requires Commerce to undertake a bifurcated

analysis in determining whether to use facts otherwise available

and, if reliance on such facts is warranted, whether to use an

adverse inference in selecting from among those facts.  First,

under the pertinent part of subsection 1677e(a):

> If——
>
>> (1) necessary information is not
>> available on the record, or
>
>> (2) an interested party or other
>> person . . .
>
>>> (C) significantly impedes
>>> a proceeding under this

> subtitle, . . .

> > the administering authority . . . shall,
> > subject to section 1677m(d) of this title,
> > use the facts otherwise available in reaching
> > the applicable determination under this
> > subtitle.

19 U.S.C. § 1677e(a)(C).  It is well settled that a party's

intent is irrelevant to a decision to use facts available.  *See*

*Ferro Union, Inc. v. United States*, 23 CIT 178, 199 n.44, 44 F.

Supp. 2d 1310, 1330 n.44 (1999) ("A respondent could impede a

review without intending to do so, for example, because it did

not understand the questions asked.").  Thus, subsection (a)

mandates the use of facts available when a respondent

significantly impedes Commerce's investigation, irrespective of

the respondent's intent.

Once it determines that the use of facts otherwise available

is required, Commerce may, if the conditions warrant, use an

inference adverse to the interests of the respondent in selecting

from those facts.[2]  The Court of Appeals for the Federal Circuit

---

[2]     Pursuant to subsection 1677e(b):

> If the administering authority . . . finds
> that an interested party has failed to
> cooperate by not acting to the best of its
> ability to comply with a request for
> information from the administering authority
> . . ., the administering authority . . ., in
> reaching the applicable determination under
> this subtitle, may use an inference that is
> adverse to the interests of that party in
> selecting from among the facts otherwise

(continued...)

in *Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir.

2003), stated that, as distinguished from subsection (a),

> subsection (b) permits Commerce to "use an
> inference that is adverse to the interests of
> [a respondent] in selecting from among the
> facts otherwise available," only if Commerce
> makes the separate determination that the
> respondent "has failed to cooperate by not
> acting to the best of its ability to comply."
> The focus of subsection (b) is respondent's
> *failure to cooperate to the best of its
> ability*, not its failure to provide requested
> information.

*Nippon Steel Corp.*, 337 F.3d at 1381 (quoting 19 U.S.C.

§ 1677e(b)) (alteration & emphasis in original).  While the

statute does not define the phrase "to the best of its ability,"

the Federal Circuit has held those words to "require[] the

respondent to do the maximum it is able to do."  *Id.* at 1382.

---

[2](...continued)
> available.  Such adverse inference may
> include reliance on information derived
> from——
>
> > (1) the petition,
> >
> > (2) a final determination in the
> > investigation under this subtitle,
> >
> > (3) any previous review under
> > section 1675 of this title
> > [periodic review] or determination
> > under section 1675b of this title
> > [countervailing duty injury
> > investigations], or
> >
> > (4) any other information placed on
> > the record.

19 U.S.C. § 1677e(b).

Here, the Department resorted to facts otherwise available
and drew an adverse inference from those facts in determining
plaintiffs' dumping margins for their "agent" sales because it
found that plaintiffs: (1) significantly impeded the
administrative review by continuously misrepresenting the nature
of their "agency" relationship; and (2) failed to cooperate to
the maximum they were able to by not revealing the true nature of
their agency relationship.

Plaintiffs, however, maintain that they neither impeded the
review nor failed to act to the best of their ability to provide
Commerce with all data regarding their "agent" sales in the
requested form and manner.  *See* Pls.' Mem. 19-20.  In making
their argument, plaintiffs point to their initial responses to
Commerce's Section A Questionnaire:

> Huarong reported that it made sales through
> an agent.  Huarong provided a copy of its
> agent agreement.  Huarong also included a
> copy of previous verification reports where
> similar "agent" sales were made. . . .
> In addition, Huarong clearly indicated that
> TMC was used as an agent.  Likewise, TMC
> properly identified that it acted as an agent
> during this period of review.  Additionally,
> Huarong and TMC properly responded to all of
> the [Department]'s interrogatories.  For
> example, Huarong provided 1) Copies of the
> purchase orders, commercial invoices, and
> proofs of order entry dates for all direct
> sales of bars during the POR, 2) Copies of
> the purchase orders, commercial invoices, and
> proofs of order entry dates for all agent
> sales of bars during the POR through TMC, and

> 3) Copies of the purchase orders, commercial
> invoices, and proofs of order entry dates for
> all direct sales of scrapers during the POR.

Pls.' Mem. 19-21 (footnotes omitted).  Thus, plaintiffs insist

that they did not impede the review and "complied to the best of

[their] ability to answer all questions the [Department] posed."

Pls.' Mem. 21.

Plaintiffs further claim that they participated in a bona

fide agency relationship and thus did not undermine the

administrative review proceedings.

> Commerce erred in stating [plaintiffs] used
> agents in an attempt to circumvent payment of
> antidumping duties.  This is not correct
> because [plaintiffs] reported their
> respective agent sales and the information
> required to calculate dumping margins.
> Plaintiffs' intent was never to have their
> respective importers avoid dumping duties.
> If Plaintiffs had the intent of circumventing
> the antidumping duty order the Plaintiffs
> would not have requested, and participated
> in, the instant administrative review.
>
> In addition, Commerce mistakes analyzing the
> relationship of Plaintiffs and confounding
> [sic] this with the separate issue of the
> importer of record.  Plaintiffs have
> participated in this review giving forth
> valid information regarding its agent sales
> and relationship with various businesses.
> Plaintiffs have never deceived Commerce nor
> provided improper information.  To the
> contrary, Plaintiffs have been forthcoming
> with all [their] dealings.  No action taken
> by the [plaintiffs] undermined Commerce's
> ability to "impose accurate antidumping
> duties" . . . .  Commerce, in fact, has not
> pointed to a specific law that has been
> violated.

Pls.' Mem. 23-24 (footnotes omitted).

With respect to Commerce's use of an adverse inference in selecting from among the facts otherwise available, plaintiffs insist that they acted to the best of their ability in providing Commerce with timely and complete responses to the questionnaires regarding their "agent" sales and, thus, an adverse inference was not supported by the record. *See* Pls.' Mem. 24.

As previously noted, Commerce used facts otherwise available to determine plaintiffs' dumping margins for their agent sales because it concluded that plaintiffs significantly impeded the review by failing to disclose the true nature of their business relationship.  In reaching this conclusion, the Department rejected plaintiffs' general claim that, because they revealed their involvement in an agency relationship, Commerce was precluded from determining their dumping margins based on facts otherwise available.  In fact, Commerce provided specific reasons for using facts available in determining plaintiffs' margins for their claimed agent sales.  First, the Department maintained that plaintiffs misrepresented the nature of their business relationship throughout the administrative review:

> After reviewing the record evidence, the
> Department found that both Huarong and TMC
> continually misrepresented the true nature of
> their relationship with their principal or
> "agent," as appropriate, during the POR.  In
> their questionnaire responses, Huarong and
> TMC claimed that their relationships with
> their "agents" or principals were *bona fide*

> business arrangements.  However, only through
> issuing multiple supplemental questionnaires
> to each [plaintiff] did the Department learn
> that nearly all of the sales functions were
> conducted by the principal, and that the
> "agent's" participation was limited, for the
> most part, to supplying blank invoices to the
> principal with an intention to circumvent the
> order.

Issues & Dec. Mem. at 6.  That is, because plaintiffs made it

appear in their initial Section A responses that their agent

sales were made pursuant to a legitimate agency relationship,

they impeded the investigation.  *Id.* at 7.

The Department then justified its use of adverse inferences

in selecting from among the facts available in accordance with 19

U.S.C. § 1677e(b) when determining plaintiffs' dumping margins:

"[T]he Department has determined that both Huarong and TMC failed

to cooperate by not acting to the best of their ability to comply

with [its] requests for information."  *Id.*  In Huarong's case,

Commerce found that

> an adverse inference [was] warranted because
> Huarong: (1) continually misrepresented the
> true nature of its relationship with the
> "agent" during the POR by portraying the
> company as a *bona fide* "agent" for the vast
> majority of Huarong's "agent" sales; (2)
> participated in an "agent" sales scheme in
> order to avoid payment of the appropriate
> cash deposit and assessment rate and
> circumvent the antidumping duty order; and
> (3) undermined [Commerce's] ability to issue
> instructions to [Customs] to assess accurate
> antidumping duties.

*Id.* at 7-8.  Likewise, for TMC, the Department concluded that

> an adverse inference [was] warranted because
> TMC: (1) continually misrepresented the true
> nature of its relationship with the principal
> during the POR by portraying itself as a *bona
> fide* "agent" for the vast majority of TMC's
> "agent" sales; (2) participated in an agent
> sales scheme in order to avoid payment of the
> appropriate cash deposit and assessment rate
> and circumvent the antidumping duty order;
> and (3) undermined [Commerce's] ability to
> issue instructions to [Customs] to assess
> accurate antidumping duties.

*Id.* at 8.  Thus, in the Final Results, Commerce applied AFA to

Huarong's and TMC's claimed agent sales of bars/wedges.

The court finds reasonable Commerce's decision to determine

plaintiffs' dumping margins for their claimed "agent" sales based

on AFA.  First, pursuant to 19 U.S.C. § 1677e(a), the Department

acted reasonably in resorting to the facts otherwise available on

the record.  By its Section A questionnaire response, Huarong

claimed that it "made some direct sales and some sales through an

agent," and further insisted that "the agent sales [were]

exported by the agent and should be properly reported by the

agent."  Huarong Resp. to Apr. 14, 2004, Questionnaire, Sec. A

(May 11, 2004) ("Huarong Sec. A Resp.") at A-2.  In addition,

Huarong submitted a copy of the purported "agency" agreement.

*See* Huarong Sec. A Resp., Ex. 3; *see also* Mem. from James C.

Doyle, Dir., AD/CVD Operations, Import Administration to Barbara

E. Tillman, Acting Deputy Assistant Secretary for Import

Administration, Application of AFA to Huarong (ITA Feb. 28, 2005)

at 1-2 ("Huarong provided the Department with two copies of the

"agent" contract with TMC, one which predates the [POR] and one

which was during the POR.  According to the contract, TMC is to

act as Huarong's 'agent' for certain sales and receive a

commission for its services.") (internal citations omitted).

Plaintiffs fail to acknowledge, however, that Commerce

discovered, after the issuance of several supplemental

questionnaires, that the business relationship between Huarong

and TMC was nothing more than a scheme apparently directed toward

circumventing the antidumping duties applicable to Huarong's

HFHTs sales to the United States.  *See* Issues & Dec. Mem. at 6

("[O]nly through issuing multiple supplemental questionnaires to

each [r]espondent did the Department learn that nearly all of the

sales functions were conducted by the principal, and that the

'agent's' participation was limited, for the most part, to

supplying blank invoices to the principal . . . .").  Thus, while

the record shows that the companies reported an "agency"

arrangement, it is apparent that both Huarong and TMC withheld

the actual details of their arrangement, information over which

they had complete command.  In other words, the mere statement

that sales were made through an agent when, in reality, the

agent's role was simply to provide the principal with blank

invoices, is not enough to preclude Commerce from resorting to

facts otherwise available.  Thus, the Department reasonably

concluded that Huarong's and TMC's failure to provide the details

of their arrangement significantly impeded the review.

Huarong's and TMC's failure to disclose fully their true
business relationship in their initial questionnaire responses
further impeded the review by preventing Commerce from issuing
accurate liquidation instructions to Customs.  Indeed, without
knowing the identity of the actual seller, any "assessment rate
calculated by the Department would be rendered meaningless
because it would not be applied to all appropriate entries."
Issues & Dec. Mem. at 6; *see also id.* at 7 ("The record evidence
gathered by the Department demonstrates that the cash deposit and
assessment rates calculated by the Department for these 'agent'
sales either would not have been the appropriate rate or would
not have been assessed by [Customs].").  Put another way, by
entering its merchandise using TMC's invoice, Huarong avoided the
higher duties that would normally attach to its entries and
instead received the lower rate applicable to TMC's entries.

It is apparent from the court's review of the record that
plaintiffs' failure to submit accurate and complete data in
response to the Department's initial questionnaire prevented the
agency from considering correct sales data.  Thus, the court
finds that the Department reasonably concluded that Huarong and
TMC significantly impeded the review and thus that the Department
was justified in its reliance on the facts otherwise available

Court No. 05-00522                                        Page  16

under 19 U.S.C. § 1677e(a).[3]

     Given that the record supports using facts otherwise

available to determine plaintiffs' dumping margins with respect

to their claimed "agent" sales, the court must now determine

whether the Department lawfully used an adverse inference when

selecting from among the facts otherwise available in accordance

with 19 U.S.C. § 1677e(b).  Under that provision, Commerce may

use an adverse inference if the respondent "has failed to

cooperate by not acting to the *best of its ability* to comply with

a request for information . . . ."  19 U.S.C. § 1677e(b)

(emphasis added).  Here, both Huarong and TMC possessed

information regarding the true nature of their purported "agency"

relationship that was material to Commerce's determination of

their antidumping duty margins, yet both submitted that data only

after the issuance of several supplemental questionnaires.  Thus,

as this Court has previously held, plaintiffs' "failure initially

to provide the relevant information with respect to their

invoicing arrangement, information that was fully within their

command, justified Commerce's application of AFA" to plaintiffs'

---

[3]     Plaintiffs have previously made these arguments before
this Court in litigation dealing with the twelfth administrative
review of the HFHTs Orders.  *See Shandong Huarong Mach. Co. v.
United States*, 30 CIT __, __, 435 F. Supp. 2d 1261, 1269–70
(2006) ("[E]ven though the Companies ultimately disclosed the
circumstances surrounding their 'agency' relationships, their
failure to do so until after the issuance of several supplemental
questionnaires surely significantly impeded Commerce's
investigation by requiring the agency to prolong its review.").

claimed "agent" sales.  *Shandong Huarong Mach. Co. v. United States*, 30 CIT __, __, 435 F. Supp. 2d 1261, 1270 (2006).


B.   Company Specific Applications of AFA

In addition to applying AFA to Huarong's and TMC's "agent" sales, Commerce also applied AFA to both companies with respect to some of their remaining sales.  Specifically, the Department applied AFA to certain of Huarong's sales of scrapers[4] and to certain of TMC's sales of picks/mattocks.


1.   Application of AFA to Huarong's Scraper Sales: Movement Expenses

As previously noted, the application of AFA is the product of a two-step analysis.  *See* 19 U.S.C. § 1677e(a), (b).  In the Final Results, the Department found warranted the use of facts otherwise available in calculating the rate applicable to Huarong's scraper sales because, in its view, Huarong "withheld information that [was] requested by the Department."[5]  Issues & Dec. Mem. at 22.  Specifically, Commerce found that Huarong failed to disclose that it shipped its merchandise to a

---

[4]     Scrapers are subject to the antidumping duty order covering axes/adzes from the PRC.  *See Olympia Indus., Inc.*, 30 CIT at __, Slip Op. 06-110 at 2-3.

[5]     Pursuant to 19 U.S.C. § 1677e(a)(2)(A), Commerce is directed to rely on facts available when reaching its determination if a respondent "withholds information that has been requested by [Commerce] . . . . ."

distribution warehouse prior to shipping the goods to the United

States despite the Department's repeated requests for that

information.

As Commerce correctly notes, under the statute, a respondent

is required to report those expenses "incident to bringing the

subject merchandise from the original place of shipment in the

exporting country to the place of delivery in the United

States . . . ."  19 U.S.C. § 1677a(c)(2)(A); *see also* Issues &

Dec. Mem. at 22 ("As has been established in prior administrative

cases, the respondent must report all movement expenses, which

includes transportation and other expenses, such as

warehousing.").  Reporting this information is important to the

dumping calculation because Commerce deducts from either

constructed export price or export price the amount of the

movement expenses.  This deduction reduces the United States

price of respondent's merchandise and, thus, increases its

dumping margin.

Here, Commerce asked Huarong twice to report the movement

expenses relating to its scraper sales, yet, Commerce found,

> [i]n its questionnaire responses, . . .
> Huarong reported that it did not ship the
> subject merchandise from the factory to a
> distribution warehouse, and, thus, did not
> incur this movement expense.  At
> verification, however, the Department noted
> that the loading notification notice for one
> sale listed an unreported movement expense.
> The Department asked for and received the
> loading notification notice for other sales,

> which also listed this unreported movement
> expense.  Moreover, when Huarong was asked
> about this expense, Huarong stated that this
> expense is incurred for all merchandise even
> though the Department noted that it was not
> reported in Huarong's U.S. sales database.
> Accordingly, the Department was not aware
> until it was discovered at verification that
> Huarong had not reported further movement
> expenses.

Issues & Dec. Mem. at 22; *see also* Verification of Sales and

Factors of Production for Huarong (ITA May, 17 2005) ("Huarong

Verification Rep.") at 17.  Thus, because Commerce did not learn

that Huarong incurred this movement expense until verification,

it concluded that Huarong withheld information.  *See* Def.'s Resp.

12 ("Verification is meant to confirm the accuracy of data

already reported, not to re-start the period for providing

data.").

In addition, the Department found that Huarong failed "to

put forth its maximum efforts to report and obtain information

from its records regarding all incurred movement expenses as

requested."  Issues & Dec. Mem. at 23.  That is, Commerce found

justified the taking of an adverse inference in selecting from

among the facts otherwise available.  *See id.*; *see also* 19 U.S.C.

§ 1677e(b).  For the Department:

> Huarong's knowledge of this movement expense
> and its decision not to report it, despite
> repeated questionnaires, properly warrants
> the use of AFA.  A reasonable [r]espondent
> would have reviewed the Department's
> questionnaires and its records and reported
> the movement expenses.  The [r]espondents

> cannot unilaterally decide what requested
> information to provide.  Accordingly, Huarong
> did not cooperate to the best of its ability
> with regard to the Department's request for
> information during the course of the
> administrative review.  It was only at the
> Department's request at verification that
> Huarong acknowledged that this unreported
> movement expense was incurred for all sales
> of axes/adzes.  Therefore, consistent with
> the Department's practice in cases where a
> respondent fails to cooperate to the best of
> its ability, and pursuant to [19 U.S.C.
> § 1677e(b)], the Department finds that the
> use of partial AFA is warranted for Huarong's
> unreported movement expense.

Issues & Dec. Mem. at 23.

   As a result of Huarong's failure to provide the movement

expense data, Commerce

> us[ed] as an adverse inference the highest
> number of days, between the date of invoice
> and the shipment date, as the time period in
> which [the] expense . . . occurred for all
> sales in which this movement expense was not
> reported.  Additionally, the Department
> [valued] this unreported movement expense for
> all sales with a publicly available Indian
> surrogate value because there is no surrogate
> value information on the record due to
> Huarong's failure to disclose this movement
> expense.

*Id.*[6]

---

   [6]   Specifically, Commerce stated that in calculating
Huarong's rate for its scraper sales:

> As an adverse inference, the Department
> calculated the highest number of days [[
>    ]], between the date of invoice and the
> shipment date, from Huarong sales traced at
> verification, as the period incurred for all
>                              (continued...)

Huarong contests both Commerce's use of facts otherwise
available and its taking of an adverse inference in calculating
the dumping margin for certain of Huarong's scraper sales.  It
argues that the application of AFA was unjustified because it
"cooperated to the best of [its] ability by reporting [its] data
as completely and as accurately as possible as can be
demonstrated by the multiple questionnaire responses submitted as
per the Department's requests."  Pls.' Mem. 28.  That is, Huarong
urges that Commerce lacked a sufficient basis for applying
partial AFA to its sales of scrapers under the axes/adzes order
because Huarong eventually complied fully with the Department's
requests for information.  *See* Pls.' Mem. 28 ("The [p]laintiff[]
behaved responsibly and reported [its] sales and other data to
the best of [its] ability. [It] certainly did not refuse to
cooperate.").

_____

[6](...continued)
          sales that did not report this movement
          expense.  The Department valued this
          unreported movement expense with a publicly
          available Indian surrogate value, which was
          deflated to be reflective of the POR.  The
          Department took the surrogate value and
          multiplied it by the [[           ]], which was
          applied as the unreported movement expense
          incurred for all Huarong's sales of
          axes/adzes.

Analysis for the Final Results of HFHTs from the PRC: Huarong
(ITA Sept. 6, 2005) ("Calculation Mem.") at 9 (citations
omitted).  In addition, Commerce provided the formula used in
calculating Huarong's axes/adzes rate using partial AFA for the
unreported movement expense.  *See* Calculation Mem. at 10–11.

Huarong raises a final point in support of its claim that partial AFA were not applicable.  It contends that, "[i]f the Department ha[d] concerns regarding the movement expenses of these sales, . . . the Department should [have] request[ed] further information from [r]espondents regarding these movement expenses."  Issues & Dec. Mem. 21.  In other words, the Department should have voiced its concerns about the questioned movement expense prior to verification.

Despite Huarong's contentions, the court finds that the record supports Commerce's decision to use AFA.  First, the court finds reasonable the Department's conclusion that Huarong withheld requested information by not reporting all of its incurred movement expenses.  Here, the record confirms that Commerce, through the issuance of several questionnaires, repeatedly asked Huarong to report its movement expenses associated with its sales to the United States of merchandise under the axes/adzes order, yet the Department did not learn that Huarong shipped its goods to a domestic warehouse until verification.  *See* HFHTs From PRC - Huarong's Resp. to Questionnaire Secs. C & D (June 9, 2004) at C-23 ("Huarong did not ship to a distribution warehouse."); *see also* HFHTs From PRC - Huarong's Resp. to Supplemental Sec. C Questionnaire (Aug. 13, 2004) at C-9.  While Huarong officials revealed at verification that the company shipped all of its axes/adzes to a domestic

warehouse prior to exporting the goods to the United States, this late revelation does not remedy Huarong's multiple failures to respond fully to Commerce's questionnaires.  *See Bomont Indus. v. United States*, 14 CIT 208, 209, 733 F. Supp. 1507, 1508 (1990) ("[V]erification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness.").  Thus, because the use of facts available requires nothing more than a respondent's failure to provide the Department with requested information, Huarong's failure to report that it shipped its goods to a domestic warehouse prior to shipping the merchandise to the United States justified Commerce's reliance on facts otherwise available.

Second, the court finds reasonable the Department's taking of an adverse inference in selecting from among those facts based on Huarong's failure to put forth its maximum effort in responding to Commerce's questions regarding the company's expenses incurred in transporting its scrapers from the factory to the United States.  In its responses to Sections C and D of Commerce's questionnaire, Huarong stated that it did not ship its scrapers to a distribution warehouse.  At verification, however, Commerce discovered that, in fact, Huarong did ship its scrapers to a domestic distribution warehouse prior to shipping the goods

Court No. 05-00522                                           Page  24

to the United States.[7]  Nothing prevented Huarong from providing

Commerce with the details of this unreported expense prior to

verification.  *See Tianjin Mach. Imp. & Exp. Corp. v. United*

*States*, 28 CIT __, __, 353 F. Supp. 2d 1294, 1305 (2004) ("A

reasonable respondent acting to the best of its ability would

have ensured that the information set forth in its . . .

questionnaire response was comprehensive.").

    In addition, Huarong erroneously contends that, if Commerce

had concerns about Huarong's reported (or unreported) movement

expenses, it should have asked for more information.  When

Huarong submitted the response in which it stated that it did not

ship its merchandise to a domestic warehouse prior to moving the

goods to the United States, Commerce had no reason to doubt that

statement's accuracy.  As a result, it was not until

_____

    [7]    While verifying Huarong's questionnaire responses:

        Analysts noted that the "Loading
        Notification" for [[          ]] states:
        [[
                                        ]].  We asked
        company officials about the [[
                ]] and they stated that the [[


                                              ]].
        We note that Huarong reported for all sales
        of scrapers in their Section C database that
        the goods were not sent to a[] domestic
        intermediate location . . ., including a
        distribution warehouse, before the
        merchandise was shipped to the United States.

Huarong Verification Rep. at 17.

verification, when Commerce discovered that Huarong had not

disclosed the expense, that the Department could have been

expected to question the accuracy of Huarong's response.  Thus,

because it had no reason to believe there were domestic warehouse

expenses prior to verification, Commerce was under no obligation

to issue a supplemental questionnaire concerning Huarong's

movement expenses.

It is evident, therefore, that Huarong, by withholding data

concerning its movement expenses, created a gap in the record

that Commerce rightly filled using facts otherwise available.  It

is equally apparent that Huarong failed to cooperate by doing the

maximum it could do to respond completely to Commerce's

questionnaires.  As a result, the court sustains the Department's

decision to account for Huarong's unreported moving expense using

facts otherwise available and its accompanying decision to use an

adverse inference when selecting from among those facts.


        2.   Application of AFA to TMC's Sales of
             Picks/Mattocks: Supplier's Factors of Production

Next, plaintiffs maintain that the Department unlawfully

applied AFA to TMC's sales of picks/mattocks because of its

"inability to verify one of TMC's supplier's factors of

production of picks/mattocks . . . ."  Pls.' Mem. 29-30.  Because

it was unable to verify this information, the Department first

applied facts available and then used an adverse inference when

selecting from among those facts.

     According to TMC, it had no control over the events that led
to its supplier's factors of production data becoming
inaccessible.  TMC makes the following representations:

>          On April 18, 2005, TMC officials informed the
>          Department that the Tianjin Tax Authority had
>          seized one of its suppliers accounting books
>          and records.  This event was completely out
>          of TMC's control.  TMC officials could not
>          have anticipated that the Tianjin Tax
>          Authority would seize its supplier's
>          accounting books and records for a random tax
>          audit.  The Department confirmed this event
>          with the supplier's general manager.
>          Moreover, because the relevant documents had
>          been seized, the supplier could offer no
>          alternative method to verify [its] factors of
>          production.

Pls.' Mem. 30 (emphasis & footnotes omitted).  Therefore, TMC
insists that it failed verification through no fault of its own,
and thus Commerce should not have applied AFA to TMC's sales of
picks/mattocks.

     The Department maintains that its decision to apply AFA in
response to TMC's failure to provide its supplier's factors of
production information for verification was reasonable.  *See*
Issues & Dec. Mem. at 41 ("TMC provided factors of
production . . . data that the Department was unable to verify
for TMC's sales of picks/mattocks.").  First, Commerce explains
its use of facts otherwise available:

>          On April 18, 2005, the day the Department
>          began verification, TMC notified the
>          Department that the books and records of its

> supplier of picks/mattocks, Dagang, were
> seized by the Tianjin Tax Authority . . . .
> On April 19, 2005 the Department conducted
> verification at Dagang's facilities to
> confirm that these records were no longer in
> the possession of Dagang and concluded that
> Dagang's [factors of production] were
> unverifiable.  As a result of the [Tianjin
> Tax Authority]'s seizure of Dagang's FY
> 2003-2004 books and records, the Department
> was unable to verify TMC's [factors of
> production] data.  In addition, as Dagang was
> TMC's sole supplier of picks/mattocks, the
> Department does not have a verified [factors
> of production] database upon which to
> calculate a normal value.  Therefore, the
> Department must rely on the facts otherwise
> available in order to determine a margin for
> TMC . . . .

*Id.* (footnote omitted).  Thus, for Commerce, while the Tianjin

Tax Authority's ("TTA") seizure of Dagang's books and records

might have been outside of TMC's control, it nevertheless created

a void in information necessary to the calculation of TMC's

dumping margin that Commerce needed to fill with facts otherwise

available.  *See* 19 U.S.C. § 1677e(a)(D).

With respect to its use of an adverse inference pursuant to

19 U.S.C. § 1677e(b), Commerce states:

> We find that an adverse inference is
> warranted in determining the facts otherwise
> available because TMC failed to act to the
> best of its ability for two reasons.  First,
> TMC failed to notify the department in a
> timely manner that Dagang's books and records
> had been seized.  TMC did not notify the
> Department of the seizure until April 18,
> 2005.  The TTA seized Dagang's books and
> records on April 1, 2005, and TMC learned of
> the seizure on April 4, 2005.  On April 4,
> 2005, the same date . . . TMC learned of the

seizure, TMC requested that the Department
postpone verification so that TMC could
attend the "Canton Trade Fair."  Thus, we
have reason to question whether TMC
misrepresented the reason for the request to
postpone verification.  In any event, on
April 5, 2005, TMC withdrew its request to
postpone verification, making no mention of
the seizure of Dagang's books and records.
When asked why it had not informed the
Department of the seizure, TMC responded that
it was not "{their} concern."  As the
Department was verifying TMC's [factors of
production], it was incumbent upon TMC to
inform the Department of any issue related to
the scheduled verification.

Second, TMC failed to provide any alternative
methodology to verify its factors of
production.  In the verification outline
released to TMC, the Department advised TMC
to make available documents relating to its
reported [factors of production]. [19 U.S.C.
§ 1677m(c)(1)] provides that, if an
interested party is unable to submit the
information requested or in the requested
form, that party is required to notify the
Department promptly and must suggest a
reasonable alternative.  As stated above, TMC
did not notify the Department in a timely
manner.  Nor is there any evidence that TMC
made an effort to contact TTA to ascertain,
for example, how long the documents would be
held or whether the documents or copies could
be made available to the Department.  In
addition, while the Department requested at
verification that Dagang provide an
alternative method of verifying its [factors
of production], neither TMC nor Dagang were
prepared to proffer alternatives.

Issues & Dec. Mem. at 41-42.  Thus, (1) because it found that TMC

failed to notify the Department of the seizure until

approximately two weeks after it learned that the records were

taken, and (2) because neither TMC nor Dagang made any effort to

obtain either the factors of production data itself or provide an

alternative information source, Commerce insists that the

application of AFA was justified.  *See* Def.'s Resp. 14 ("An

adverse inference was warranted because a reasonable respondent

would have made some effort to ensure Commerce would be able to

verify the information that it had reported.").

The court finds that the record supports Commerce's

application of AFA in constructing TMC's factors of production

for its sales of picks/mattocks.  First, by failing to have

available for inspection information necessary to verify the

calculation of its dumping margin, TMC triggered the Department's

use of facts otherwise available.  *See Nippon Steel Corp.*, 337

F.3d at 1383.  That is, Commerce was unable to verify TMC's

factors of production data and thus was required to determine

TMC's dumping rate using facts available.

Second, the court's review of the record reveals substantial

support for Commerce's use of an adverse inference pursuant to 19

U.S.C. § 1677e(b).  As previously noted, the Department may use

an adverse inference when selecting from among the facts

otherwise available if it determines that the respondent has

"failed to cooperate by not acting to the best of its ability to

comply with a request for information" from Commerce.  19 U.S.C.

§ 1677e(b).  Here, the record makes clear that TMC became aware

of the seizure of Dagang's factors of production data on April 4,

2005.  *See* Verification of Sales for TMC in the 13th Admin. Rev.

of HFHTs from the PRC (ITA May 23, 2005) at 12 ("TMC officials

stated that they did not know about this situation until April 4,

2005 when they were faxed copies of the 'Notice on Tax

Investigation' and 'Notice on Holding Account Ledgers for Tax

Investigation.'").  Rather than inform the Department of this,

TMC instead asked that verification be postponed so that it could

attend a trade fair, a request that it subsequently withdrew.

TMC only made known the fact that Dagang's books and records had

been seized at verification, which took place two weeks after TMC

concedes it learned of the seizure.  *See* Issues & Dec. Mem. at

42.

        Moreover, it is clear from the record that TMC neither made

any effort to secure from the TTA copies of the seized records,

nor attempted to suggest an alternative method for calculating

the factors of production as was its right under 19 U.S.C.

§ 1677m(c)(1).[8]  Indeed, Commerce stated that "[h]ad TMC provided

---

[8]     That subsection provides:

        If an interested party, promptly after
        receiving a request from the administering
        authority . . . for information, notifies the
        administering authority . . . that such party
        is unable to submit the information requested
        in the requested form and manner, together
        with a full explanation and suggested
        alternative forms in which such party is able
        to submit the information, the administering
        authority . . . shall consider the ability of
                                        (continued...)

Court No. 05-00522                                    Page  31

the information in a timely manner the Department may have had

time to pursue any proposed alternatives, including, for example,

alternative methods of verifying TMC's factors of production

data . . . ."  Issues & Dec. Mem. at 42.  Thus, it is apparent

that by failing to inform the Department of the seizure, and by

making no effort to obtain copies of the documents or suggest a

potential solution to the problem, TMC did not do the maximum it

was able to do to respond to Commerce's request.  *See Nippon*

*Steel Corp.*, 337 F.3d at 1382.

     Based on the foregoing, the court finds that Commerce's

application of AFA to TMC's sales of picks/mattocks is supported

by the record.[9]


III. AFA Rates for Bars/Wedges, Axes/Adzes and Picks/Mattocks

     Huarong and TMC next claim that the rates imposed by the

Department on their sales of bars/wedges, axes/adzes and

---

     [8](...continued)
          the interested party to submit the
          information in the requested form and manner
          and may modify such requirements to the
          extent necessary to avoid imposing an
          unreasonable burden on that party.

19 U.S.C. § 1677m(c)(1).

     [9]   Because the court finds Commerce's application of AFA
to Huarong and TMC to be supported by substantial evidence and in
accordance with law, it further finds without merit plaintiffs'
contention that the Department should have instead applied
combination cash deposit rates to plaintiffs' merchandise.

picks/mattocks as a result of the application of AFA were

unreasonable.  *See* Pls.' Mem. 11-18.


A.   AFA Rate for "Agent" Sales of Bars/Wedges

Plaintiffs insist that even if the application of AFA to

their sales of bars/wedges as a result of their purported

"agency" relationship is warranted, the rate applied as AFA is

not.  For its part, Commerce maintains that the 139.31 percent

rate, which was taken from TMC's calculated rate in the eighth

review of the HFHTs Orders, was reasonable.  *See* Issues & Dec.

Mem. at 9; *see also* Def.'s Resp. 16-17.  According to the

Department:

> Because the AFA rate is based on TMC's actual
> sales data, it directly bears a "rational
> relationship" to TMC.  The Department also
> finds that this rate "bears a rational
> relationship" to Huarong's commercial
> activity because both Huarong and TMC export
> identical products covered by the bars/wedges
> order and compete for sales within the U.S.
> market.

Issues & Dec. Mem. at 10.  Thus, for Commerce, while the rate is

relevant to TMC because it was calculated using that company's

sales data in an earlier review, the rate is equally applicable

to Huarong based on its participation in the same market as TMC.

In addition to the rate's relevance, the Department further

states that

> this rate is appropriate because it has been
> upheld [in *Shandong Huarong General Corp. v.*

> *United States*, 25 CIT 1226, 177 F. Supp. 2d
> 1304 (2001)] as reflective of TMC's recent
> commercial activity in exporting bars/wedges
> to the United States.  This rate is also the
> PRC-wide rate of 139.31 percent for
> bars/wedges published in the most recently
> completed administrative review of this
> antidumping duty order.  Moreover, this rate
> is the highest rate in the proceeding and was
> calculated using verified information
> provided by TMC during the 8th administrative
> review of the bars/wedges order.
> Accordingly, the Department continues to find
> that this rate, instead of other recently
> calculated rates, offers a more adequate
> incentive to induce Huarong and TMC to
> cooperate in this proceeding.

*Id.*

For their part, plaintiffs argue that the 139.31 percent rate "is punitive and does not reflect a reasonable dumping margin."  Pls.' Mem. 16.  In support of its position, plaintiffs rely on this Court's decision in *Shandong Huarong General Group Corp. v. United States*, 28 CIT __, Slip Op. 05-129 (Sept. 27, 2005) (not reported in the Federal Supplement), remanding Commerce's decision to apply the 139.31 percent rate to the companies' sales of bars/wedges in the ninth administrative review of the HFHTs Orders.  In that case, the court concluded that the 139.31 percent rate was both aberrational and punitive. *See id.* at __, Slip Op. 05-129 at 21.  On remand, Commerce lowered the 139.31 percent to 47.88 percent.  The court sustained this rate as both reliable and bearing a rational relationship to the respondents.  *See Shandong Huarong Gen. Group. Co. v. United*

*States*, 31 CIT __, __, Slip Op. 07-4 at 8 (Jan. 9, 2007) (not

reported in the Federal Supplement) ("[T]he court finds that

Commerce has explained adequately the reliability and relevance

of the 47.88 percent rate with respect to the Companies' sales of

bars and wedges.").  Plaintiffs cannot discern a difference

between the facts of that review and those presently before the

court.  As a result, plaintiffs seek a remand of Commerce's

decision to apply the 139.31 percent rate to their sales of

bars/wedges.[10]

     Where Commerce relies on secondary information in

determining dumping margins, it is statutorily mandated to

"corroborate that information from independent sources that are

reasonably at their disposal."  19 U.S.C. § 1677e(c).  The

Federal Circuit has stated that "[i]t is clear from Congress's

imposition of the corroboration requirement in 19 U.S.C.

§ 1677e(c) that it intended for an adverse facts available rate

to be a reasonably accurate estimate of the respondent's actual

rate, albeit with some built-in increase intended as a deterrent

_____

     [10]   Plaintiffs further contend that Commerce is precluded
from using TMC's calculated rate from the eighth review because
that rate was calculated using Indian data that plaintiffs insist
were distorted by subsidies.  The court notes that: (1) plaintiff
put no actual evidence of subsidization on the record, either in
this review or during the eighth review; and (2) the issue of
subsidization was not raised during plaintiffs' challenge to the
final results of the eighth review before this Court.  *See
Shandong Huarong Gen. Corp. v. United States*, 25 CIT 1226, 177 F.
Supp. 2d 1304 (2001).  As a result, plaintiffs are foreclosed
from making their claim now.

to non-compliance." *F.Lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000). That is, "Congress could not have intended for Commerce's discretion to include the ability to select unreasonably high rates with no relationship to the respondent's actual dumping margin." *Id.* As this Court has held, "[a]n AFA rate must be both reliable and bear and a rational relationship to the respondent." *Shandong Huarong Gen. Group Corp.*, 31 CIT at __, Slip Op. 07-4 at 9. In other words, Commerce may not simply select as AFA the highest possible rate as punishment for a respondent's unwillingness to cooperate. *See Gerber Food (Yunnan) Co. v. United States*, 31 CIT __, 491 F. Supp. 2d 1326, 1348 (2007) ("The statute does not permit Commerce to choose an antidumping duty assessment rate as an adverse inference without making factual findings, supported by substantial evidence.") (internal quotation marks & citation omitted); *see also Shandong Huarong Mach. Co.*, 30 CIT at __, 435 F. Supp. 2d at 1274-75. Finally, this Court has interpreted Congress's intent as requiring Commerce to select an AFA rate that is both reliable and bears a rational relationship to the respondent, not just the industry on the whole. *See Shandong Huarong Gen. Group Corp.*, 31 CIT at __, Slip Op. 07-4 at 7 ("[T]he law requires that an assigned rate relate to the company to which it is assigned.") (internal quotation marks & citation omitted).

Commerce has failed to meet these standards in making the
case for its use of the 139.31 percent rate for TMC's and
Huarong's sales of bars/wedges.  With respect to the "agent"
sales, Commerce has no verified information from which to
calculate an actual rate.  Thus, Commerce selected a rate from a
previous review.  In support of its application of the 139.31
percent rate to TMC, Commerce relies solely on the evidence that
the rate was calculated for TMC using that company's own verified
information in the eighth administrative review of the HFHTs
Orders (for the period of review 1998–1999).  While Commerce has
shown that the rate, having been calculated using the
respondent's own verified data, was reliable when calculated, it
has failed to explain how the rate is relevant to TMC's sales
activity during the thirteenth review.  Such an explanation is
particularly warranted here where there are more recent rates for
TMC that are lower.  *See, e.g.*, HFHTs From the PRC, 66 Fed. Reg.
48,026, 48,029 (Dep't of Commerce Sept. 17, 2001) (final results)
(assigning TMC's sales of bars/wedges between February 1, 1999,
and January 31, 2000, a rate of 0.56 percent); HFHTs From the
PRC, 64 Fed. Reg. 43,659, 43,671 (Dep't of Commerce Aug. 11,
1999) (final results) (assigning TMC's sales of bars/wedges
between February 1, 1997, and January 31, 1998, a rate of 47.88
percent).  In failing to explain how the facts and circumstances
present here justify a higher rate than those earlier reviews,

Commerce has failed in its duty to estimate "respondent's actual rate" during the POR.  *See De Cecco*, 216 F.3d at 1032.

With respect to Huarong, the Department does nothing more than state that, because Huarong is involved in the same industry as TMC, the 139.31 percent rate is relevant to Huarong.  In other words, that rate is reflective of what Huarong's rate would have been had it complied, albeit with an increase intended to deter future uncooperative behavior.  As noted, Commerce must demonstrate that the rate it selects as a result of the application of AFA is both reliable and relevant to the individual respondent, not simply the subject industry as a whole.  By merely noting that Huarong and TMC are participants in the same industry, Commerce has not sufficiently explained how the 139.31 percent rate relates to Huarong.  In other words, the Department has not articulated how the 139.31 percent rate is a reasonable estimate of what Huarong's rate would have been had it complied together with a built-in increase as a deterrent.

Based on the foregoing, the court remands the issue to Commerce with instructions to: (1) explain (a) how the 139.31 percent rate applied to TMC's and Huarong's sales of bars/wedges is a reasonably accurate estimate of TMC's actual rate with a built-in increase to deter non-compliance and, in particular, how that rate is more accurate than other rates calculated for TMC; and (b) explain in detail how any rate assigned to Huarong is

reliable and bears a rational relationship to the company itself;
or (2) reopen the record and calculate an AFA rate to be applied
to Huarong's and TMC's sales of bars/wedges, with an additional
amount to deter future non-compliance.


    B.   AFA Rate for Huarong's Sales of Axes/Adzes

    As discussed *supra*, the Department found warranted the
application of AFA to Huarong's sales of axes/adzes based on the
company's failure to report fully its movement expenses, i.e.,
that Huarong failed to report that it shipped its merchandise to
a domestic storage warehouse prior to shipping the goods to the
United States.  Commerce, therefore, as it had in several prior
cases, used "as an adverse inference the highest number of days,
between the date of invoice and the shipment date, as the time
period in which [the movement expense] occurred for all sales in
which this movement expense was not reported."  Issues & Dec.
Mem. at 23.  The Department further decided to "valu[e] this
unreported movement expense for all sales with a publicly
available Indian surrogate value because there is no surrogate
value information on the record due to Huarong's failure to
disclose this movement expense."  *Id*.  For the Department, this
method ensured that "Huarong's margin for sales of axes/adzes was
calculated using Huarong's information."  Def.'s Resp. 17.  As a
result, certain of Huarong's sales of axes/adzes received a

calculated rate of 174.58 percent.

Plaintiffs do not contest the Department's methodology
employed in calculating the unreported movement expense, rather
they contend that Commerce's reliance on Indian surrogate data is
misplaced.  Plaintiffs first state that Commerce is precluded by
its own past practice from using Indian surrogate data "because
of Indian subsidies."  Pls.' Mem. 11.

In addition, plaintiffs maintain that the axes/adzes rate is
artificially inflated because of Commerce's improper inclusion of
scraper sales.  According to plaintiffs, "[t]he Department should
have excluded scrapers from the calculated PRC-Wide and AFA rate
for axes/adzes as these rates were based solely on Huarong's
sales of scrapers."  Pls.' Mem. 17.  Plaintiffs apparently
contend that, had Commerce excluded Huarong's scraper sales, here
the sales of the MUTT scraper, the AFA rate would be
substantially lower.

The court finds that the Department has supported with
substantial evidence its determination to use AFA to calculate
the rate applicable to Huarong's sales of axes/adzes.  In this
case, Huarong's failure to report the movement expense resulted
in the absence from the record of a surrogate value for that
expense.  That is, because it was not known that the expense had
been incurred, no party put a surrogate value on the record.
Commerce, therefore, relied on a publicly available Indian

surrogate value to calculate the unreported movement expense.

While plaintiffs insist that the surrogate value Commerce

employed was distorted by subsidies, they have provided no

evidence to support their assertion.  Thus, the court cannot

credit plaintiffs' subsidy objection.

The court also finds no merit in Huarong's assertion that

the inclusion of its sales of the MUTT scraper under the terms of

the order applicable to axes/adzes was in error and increased

artificially the AFA rate.  This Court has held that the MUTT is,

in fact, subject to the terms of the axes/adzes order.  *See*

*Olympia Indus., Inc. v. United States*, 30 CIT __, __, Slip Op.

06-110 at 2-3 (July 24, 2006) (not reported in the Federal

Supplement) ("Because the MUTT's utility as a tool comes from its

steel head with a sharp blade that can be used for cutting and

chopping, the court finds that it is a hewing tool similar to an

axe or adze and, thus, sustains Commerce's Final Scope Ruling.").

Therefore, the court sustains as supported by substantial

evidence and otherwise in accordance with law Commerce's

calculation of the 174.58 percent rate.


C.   AFA Rate for TMC's Sales of Picks/Mattocks

The Department selected 98.77 percent, "the highest margin

from this or any prior segment of the proceeding," as an AFA rate

for TMC's sales of picks/mattocks based on the company's failure

to have available for inspection at verification its sole
supplier's factors of production data.  Issues & Dec. Mem. at 43
("The Department . . . has determined to use a rate calculated
for another respondent and the PRC-wide rate as AFA.").  The
selected rate was first "calculated in the 5th review and
corroborated in the Final Results of the 12th review as amended."
Final Results, 70 Fed. Reg. at 54,899; *see also* HFHTs From the
PRC, 62 Fed. Reg. 11,813, 11,819 (Dep't of Commerce Mar. 13,
1997) (final results) (fifth admin. rev.); HFHTs From the PRC, 69
Fed. Reg. 55,581 (Dep't of Commerce Sept. 15, 2004) (final
results) (twelfth admin. rev.).  In support of its decision not
to calculate a rate, Commerce explains that it "was unable to
conduct verification of the factors of production used in the
preliminary rate calculation."  Issues & Dec. Mem. at 43.
Further, Commerce maintains that its use of a previously
calculated rate as AFA "from the current or a prior segment of
the proceeding," renders the rate reliable.  *See* 19 U.S.C.
§ 1677e(c).

     For their part, plaintiffs reassert their arguments that the
selected AFA rate was calculated using subsidized prices and
bears no relation to TMC.

     While, for the reasons previously stated, the court does not
credit plaintiffs' subsidy argument, it finds that Commerce has
not explained adequately why it selected the 98.77 percent rate

to apply to TMC's sales of picks/mattocks.  As previously

mentioned, "[t]he statute requires Commerce to select an

antidumping duty rate that is a reasonably accurate estimate of

the respondent's actual rate."  *Gerber Food (Yunnan) Co.*, 31 CIT

at __, 491 F. Supp. 2d at 1348-49 (internal quotation marks &

citations omitted).  In addition, the rate must be both reliable

and relevant to the company to which the rate is assigned.  Here,

because Dagang was TMC's sole supplier of picks/mattocks, the

absence of that company's factors of production data meant that

the Department did not have verified facts to rely on in

calculating an actual rate for TMC.

Commerce justifies the chosen rate's reliability by stating

that it was calculated for another respondent in a prior segment

of these proceedings.  This, however, is not sufficient for the

court to find that the selected rate was a reasonably accurate

reflection of what TMC's actual rate would be during the POR.

This is particularly the case where there have been other lower

rates recently calculated for TMC's sales of picks/mattocks.

*See, e.g.*, HFHTs From the PRC, 69 Fed. Reg. 55,581 (Dep't of

Commerce Sept. 15, 2004) (assigning a 4.76 percent rate to TMC's

picks/mattocks for February 1, 2002, through January 31, 2003);

HFHTs From the PRC, 66 Fed. Reg. 48,026, 48,029 (Dep't of

Commerce Sept. 17, 2001) (assigning a 0.02 percent rate to TMC's

sales of picks/mattocks from February 1, 1999, through January

31, 2000). The 98.77 percent rate, therefore, may not represent a reasonable estimate of what TMC's rate would have been had the respondent cooperated, albeit with a built-in increase to deter future non-compliance. *See De Cecco*, 216 F.3d at 1032. While the record may not contain evidence sufficient to permit Commerce to calculate an actual dumping margin for TMC, the Department must nonetheless justify its decision to select a rate from a prior review as an AFA rate. In other words, the absence of verifiable evidence does not release Commerce from its obligation to apply an AFA rate that is reasonable, bears a rational relationship to the respondent and reasonably reflects what the respondent's actual rate would have been. Thus, Commerce must do more than simply select a high rate from a prior review. On remand, the Department is instructed to: (1) explain (a) how the 98.77 percent rate for TMC's picks/maddocks is a reasonably accurate estimate of TMC's actual rate with a built-in increase to deter non-compliance; and (b) why it did not select as an AFA rate for TMC's sales of picks/mattocks one of the previously assigned lower rates, albeit with a built-in increase to deter future non-compliance; or (2) reopen the record and obtain evidence to support an actual calculated rate for TMC's sales of picks/mattocks.

CONCLUSION

Based on the foregoing, the court remands Commerce's Final
Results for further action in accordance with this opinion.
Remand results are due on November 28, 2007.  Comments on those
remand results are due on December 28, 2007.  Replies to such
comments are due on January 8, 2008.


                                      /s/ Richard K. Eaton
                                     Richard K. Eaton


Dated:     August 28, 2007
           New York, New York

## NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____    By: _____
                                                                    Deputy Clerk