Slip Op. 11-1

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| TIANJIN MACHINERY IMPORT & EXPORT CORP. and SHANDONG HUARONG MACHINERY CO., LTD., | : | |
|  | : | |
| Plaintiffs, | : | |
|  | : | Before: Richard K. Eaton, Judge |
| v. | : | |
|  | : | Court No. 05-00522 |
| UNITED STATES, | : | |
|  | : | **Public Version** |
| Defendant, | : | |
|  | : | |
| and | : | |
|  | : | |
| AMES TRUE TEMPER, | : | |
|  | : | |
| Deft.-Int. | : | |

OPINION AND ORDER

[United States Department of Commerce's Final Results of Redetermination, as supplemented, are sustained in part and remanded.]

Dated: January 4, 2011

*Hume & Associates LLC* (*Robert T. Hume*), for plaintiffs.

*Tony West*, Assistant Attorney General; *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, Civil Division, Commercial Litigation Branch, United States Department of Justice (*Michael D. Panzera*); Office of the Chief Counsel for Import Administration, United States Department of Commerce (*Aaron P. Kleiner*), of counsel, for defendant.

*Wiley Rein LLP* (*Timothy C. Brightbill*), for defendant-intervenor.

Eaton, Judge: At issue in this action are the United States Department of Commerce's ("Commerce" or the "Department") final results of the thirteenth administrative review of four

antidumping duty orders applicable to imports into the United

States of heavy forged hand tools ("HFHTs") from the People's

Republic of China ("PRC").  *See* HFHTs, Finished or Unfinished,

With or Without Handles, From the PRC, 70 Fed. Reg. 54,897 (Dep't

of Commerce Sept. 19, 2005) (final Results of antidumping duty

administrative reviews) (the "Final Results"); *see also* HFHTs,

Finished or Unfinished, With or Without Handles From the PRC, 56

Fed. Reg. 6,622 (Dep't of Commerce Feb. 19, 1991) (notice of

antidumping duty orders) (covering axes/adzes, bars/wedges,

hammers/sledges and picks/mattocks) (the "HFHTs Orders").   In

*Tianjin Machinery Import & Export Corp. v. United States*, 31 CIT

1416 (2007) (not reported in the Federal Supplement) ("*Tianjin

I*"), the court sustained certain aspects of the Final Results and

remanded several issues to the Department.

Subsequently, the court also ordered the Department to

reopen the record as to one of those issues and to address the

merits of plaintiffs' chart submissions, which purportedly

demonstrated "that TMC and Huarong's steel type and the steel

surrogate values differed in recent reviews . . . and . . . that

these differences significantly impacted the resulting margins

relied upon by Commerce in its AFA anaylsis."  *Tianjin Machinery

Import & Export Corp. v. United States*, Ct. No. 05-00522, Order

at 4 (June 8, 2009) (directing Commerce to place plaintiffs'

charts on the record and to offer a response to them) ("*Tianjin*

*II"*).

Now before the court are Commerce's Final Results of

Redetermination as supplemented.  *See* Final Results of

Redetermination (Dep't of Commerce Mar. 11, 2008) (the "First

Remand Results"); Final Results of Redetermination Pursuant to

Court Order (Dep't of Commerce Sept. 16, 2009) (the "Supplemental

Remand Results") (collectively, the "Remand Results").  The court

has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2006) and 19

U.S.C. § 1516a(a)(2)(B)(iii).  For the following reasons, the

Remand Results are sustained, in part, and remanded.


STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding,

or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with

law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(I).


DISCUSSION

I.   Legal Framework for Adverse Facts Available Rates

When periodically reviewing antidumping duties for an

uncooperative party, Commerce "may use an inference that is

adverse to the interests of that party in selecting from among

the facts otherwise available."  19 U.S.C. § 1677e(b).  While the

court has previously sustained[1] Commerce's threshold decision to

use Adverse Facts Available[2] ("AFA"), questions remain about the

---

[1]     The court sustained the application of AFA to TMC's and
Huarong's sales of bars/wedges: "[A]s this Court has previously
held, plaintiffs' 'failure initially to provide the relevant
information with respect to their invoicing arrangement,
information that was fully within their command, justified
Commerce's application of AFA' to plaintiffs' claimed 'agent'
sales." *Tianjin I*, 31 CIT at 1424 (quoting *Shandong Huarong
Mach. Co. v. United States*, 30 CIT 1269, 1278, 435 F. Supp. 2d
1261, 1270 (2006)).  As to TMC's sales of picks/mattocks, the
court found that "based on the company's failure to have
available for inspection at verification its sole supplier's
factors of production data," "Commerce's application of AFA . . .
[was] supported by the record." *Tianjin I*, 31 CIT at 1437, 1432
(citation omitted).

[2]     Pursuant to 19 U.S.C. § 1677e(a), if:

          (1) necessary information is not available on
          the record, or

          (2) an interested party or any other person—

                    (A) withholds information that has
                    been requested by the administering
                    authority or the Commission under
                    this subtitle,

                    (B) fails to provide such
                    information by the deadlines for
                    submission of the information or in
                    the form and manner requested, . .
                    .

                    (C) significantly impedes a
                    proceeding under this subtitle, or

                    (D) provides such information but
                    the information cannot be verified
                    . . .,

          the administering authority and the Commission shall,
          subject to section 1677m(d) of this title, use the
                                                    (continued...)

Court No. 05-00522                                    Page  5

manner in which the adverse inferences, arising from that

decision, were used "in selecting from among the facts otherwise

available."  19 U.S.C. § 1677e(b).  In particular, plaintiffs

contest the Department's application of adverse inferences when

choosing from the facts otherwise available to select their

individual AFA rates.


II.  AFA Rate for TMC's and Huarong's Sales of Bars/Wedges

       In *Tianjin I*, the court found that Commerce did not present

substantial evidence to justify its decision to assign an AFA

rate of 139.31 percent to Tianjin Machinery Import & Export

Corp.'s ("TMC") and Shandong Huarong Machinery Co., Ltd.'s

("Huarong" and, collectively, "plaintiffs") for their sales of

bars/wedges.  This rate had been calculated for TMC in the eighth

administrative review of the HFHTs Orders and is the highest

calculated rate under the Orders.  *See Tianjin I*, 31 CIT at 1434.

On remand, the court directed the Department to either "explain .

. . how the 139.31 percent rate applied to TMC's and Huarong's

---

[2](...continued)
       facts otherwise available in reaching the applicable
       determination under this subtitle.

       If Commerce determines that the above criteria are met, and
makes the separate subjective determination that the respondent
has "failed to cooperate by not acting to the best of its ability
to comply with a request for information," then, under 19 U.S.C.
§ 1677e(b), the agency "may use an inference that is adverse to
the interests of that party in selecting from among the facts
otherwise available."  19 U.S.C. § 1677e(b).

sales of bars/wedges is a reasonably accurate estimate of TMC's actual rate with a built-in increase to deter non-compliance . . . and . . . [to] explain in detail how any rate assigned to Huarong is reliable and bears a rational relationship to the company itself" or "reopen the record and calculate an AFA rate to be applied to Huarong's and TMC's sales of bars/wedges, with an additional amount to deter future non-compliance." *Id.* at 1435.

In the First Remand Results, Commerce did not change the 139.31 percent rate for TMC's and Huarong's sales of bars/wedges, nor did it formally reopen the record, as permitted by the court, to calculate new AFA rates.  Instead, the Department insisted that it complied with the court's remand instructions by further explaining the applicability of the 139.31 percent rate to TMC and Huarong, and providing additional factual support for this determination.  *See* First Remand Results at 2, 6.

Responding to the First Remand Results, plaintiffs claimed that Commerce's new justifications were based on information not on the record.  *Tianjin II*, Ct. No. 05-00522, at 4.  In making their argument, plaintiffs primarily objected to Commerce's reliance on newly produced data from United States Customs and Border Protection.  *Id.* at 3–4.  As a result, they sought an opportunity to put on the record information of their own, consisting of several charts purportedly demonstrating "that

TMC['s] and Huarong's steel type and the steel surrogate values
differed in recent reviews[] . . . and . . . these differences
significantly impacted the resulting margins relied upon by
Commerce in its AFA analysis." *Id.* at 4.

The court agreed with plaintiffs that Commerce had
"independently accessed Customs data to substantiate its
results." *Id.* at 5.  Likewise, the court also agreed that the
plaintiffs' charts were "relevant to the probative value of
Commerce's weighted-average unit value analysis" and that the
information "should be fully vetted by the Department at the
administrative level." *Id.* at 5—6.  As a result, the court
remanded the matter again, and ordered Commerce to "address the
impact of plaintiffs' charts . . . to their selection of AFA
rates for TMC['s] and Huarong's sales of bars/wedges." *Id.* at 6.

In the Supplemental Remand Results, Commerce retained its
initial rates, finding that plaintiffs' charts and arguments did
not "provide[] information or argument sufficient to change the
Department's selection of 139.31 percent rate for either TMC's or
Huarong's sales of bars/wedges."  Supplemental Remand Results at
2.


A.   TMC

In *Tianjin I*, the court concluded that the 139.31 percent
rate did not bear a rational relationship to TMC's sales of

bars/wedges during the period of review ("POR"), i.e., February

1, 2003 to January 31, 2004. *Tianjin I*, 31 CIT at 1434–35.  In

reaching this conclusion, the court found that Commerce could not

rely on TMC's rate from the eighth administrative review of the

HFHTs Orders (covering the POR February 1, 1998 to January 31,

1999) without explaining its relevance to the thirteenth

administrative review, which took place some five years later.

      On remand, Commerce has chosen to comply with *Tianjin I*'s

directives by seeking "additional information to determine

whether TMC's sales during the eighth administrative review

continue[] to reflect TMC's commercial activity during the [POR]

for the thirteenth review."  *See* Def.'s Resp. to Comments

Regarding the Remand Redetermination 5 (citing First Remand

Results at 2).  In order to demonstrate how the 139.31 percent

rate is reflective of TMC's recent commercial activity, Commerce

cites the following additional factual support:

> The Department obtained information from the
> Automated Commercial System (ACS) of U.S.
> Customs and Border Protection (CBP) regarding
> sales values of TMC's merchandise
> classifiable under harmonized tariff schedule
> subheading 8205.59.30, the subheading
> applicable to the merchandise subject to the
> bars/wedges order.  The Department
> specifically queried the two review periods
> at issue: February 1, 1998, through January
> 31, 1999 [the eighth review], and February 1,
> 2003, through January 31, 2004 [the
> thirteenth review].  Using this information,
> the Department calculated a weighted-average
> unit value (AUV) for each period for TMC's
> sales of merchandise subject to the

> bars/wedges order.  The Department compared
> the AUV from each period and found that TMC's
> AUV for the subject merchandise declined
> . . . from the earlier to the later period.
> This change in TMC's AUVs contrast[s] with
> little to no change in the production process
> used by the PRC industry to produce
> bars/wedges over the last five years, as
> demonstrated by respondent questionnaire
> responses and verifications from multiple
> administrative proceedings.  Thus, because
> the production process of the industry has
> generally stayed constant, while TMC's U.S.
> sales values have declined, the Department
> concludes that this information further
> substantiates the relevance of the 139.31
> percent margin as AFA for TMC's sales of
> merchandise under the bars/wedges order.

First Remand Results at 6—7 (citations omitted).  Thus, Commerce

insists that a steep decline[3] in the price at which the

merchandise was sold into the United States, while the production

process used to make the bars/wedges stayed constant, is

"probative evidence of TMC's continued dumping of hand tools on

the United States market."  Def.'s Resp. To Court's Letter Dated

June 11, 2010 3 (emphasis removed).  In other words, for Commerce

the price decline from the eighth review to the thirteenth

review, during which period nothing changed in the way the

merchandise was made, indicates that, not only did TMC continue

to dump its products, but that the dumping margin, if anything,

had increased.

---

[3]     TMC's AUV "declined by 34.33 percent from the earlier
[eighth review] to the later period [thirteenth review]."  First
Remand Results at 7.

Next, the Department points to, what it calls, the
volatility of TMC's margins in past reviews as further evidence
of the relevance of the 139.31 percent rate.  Specifically,
Commerce notes that: (1) in the seventh review, it assigned TMC
an AFA rate of 47.88 percent; (2) in the eighth review, it
calculated the 139.31 percent rate (an increase of ninety-two
percentage points); (3) in the ninth review, it calculated a 0.56
percent rate (a 248-fold decrease); (4) in the tenth review, it
calculated a 0.48 percent rate (a de minimus change from the
ninth review); and, (5) in the twelfth review, sustained by the
court in *Shandong Huarong Machinery Co., Ltd. v. United States*,
31 CIT 1815, 1820 (2007) (not reported in the Federal Supplement)
("*Shandong*"), Commerce, using AFA, assigned the 139.31 percent
rate calculated in the eighth review.  *See* First Remand Results
at 7–8.  Accordingly, for Commerce, the "wide swings" experienced
by TMC in its prior administrative reviews of bars/wedges
demonstrates the continued reliability of the 139.31 percent
rate.  *Id.* at 8; *see also id.* at 7 ("[A] review of the volatility
of TMC's margins in past reviews provides further factual support
for the relevance of the 139.31 percent rate.").  Thus, Commerce
asserts that the 139.31 percent rate is consistent with TMC's
varying rate history.

As to why the 139.31 percent rate is more accurate than more
recent lower rates calculated for TMC, the Department argues:

> Because TMC's sales of bars/wedges are
> receiving total adverse facts available[4] due
> to its involvement in the "agent" sales
> scheme, we do not find that using one of
> TMC's prior lower rates would be appropriate
> as an AFA rate.  In administrative reviews
> where TMC received lower rates, not only did
> TMC fully participate in those proceedings,
> but TMC did not receive total AFA.  As a
> result, it would be difficult to reconcile
> applying a lower rate to TMC as AFA in this
> review when those lower rates were not
> calculated based on AFA.

First Remand Results at 9.

     With respect to the steel valuation charts plaintiffs have

now placed on the record, Commerce maintains that it "cannot

compare the steel used for TMC or Huarong in the [thirteenth]

administrative review with the [eighth] administrative review"

because the Department believes, based on the companies'

participation in the fraudulent invoicing scheme that the new

data, like all of the companies' questionnaire responses, is not

reliable.  Supplemental Remand Results at 8.  "As such, the

Department has no reliable information upon which to conclude

that the steel surrogate values would be different—or how they

would be different—than the surrogate values applied in the 8th

administrative review."  Id.  Put another way, because of the

_____

[4]     While the phrase "total adverse facts available" is not
referenced in either the statute or the agency's regulations, it
can be understood, within the context of this case, as referring
to Commerce's application of the "facts otherwise available" and
"adverse inferences" provisions of 19 U.S.C. § 1677e after
rejecting as untrustworthy all information submitted by
respondents in this review.

plaintiffs' failure to disclose their true business

relationship,[5] Commerce has concluded that it cannot trust any of

the steel valuation data they have offered.

Further, Commerce contends that, even if it did consider the

explanatory charts, they would not be sufficient to explain why

the margin for the thirteenth review would not be the same as or

higher than the eighth. *Id.* In making this argument, the

Department stresses that the dumping margin is not derived solely

on the surrogate steel value, but is based on several factors of

production. *See id.* at 9 ("Plaintiffs' argument examines only

one component of the normal value . . . . Without considering

the differences in consumption rates for all [factors of

production] (e.g., material inputs, energy and labor) between

segments, we cannot assume, as plaintiffs argue, that the

difference in margins would simply be due to a change in the

---

[5]     As explained in *Tianjin I*:

> Plaintiffs fail to acknowledge . . .
> that Commerce discovered, after the issuance
> of several supplemental questionnaires, that
> the business relationship between Huarong and
> TMC was nothing more than a scheme apparently
> directed toward circumventing the antidumping
> duties applicable to Huarong's HFHTs sales to
> the United States. . . . [T]he mere statement
> that sales were made through an agent when,
> in reality, the agent's role was simply to
> provide the principal with blank invoices, is
> not enough to preclude Commerce from
> resorting to facts otherwise available.

31 CIT at 1423.

surrogate values for steel."). Commerce also notes the margin

is sensitive to the U.S. price. *See id*. at 8—9 ("While

plaintiffs seem to claim that the surrogate values that would

have been used in the 13th administrative review would have been

lower than the surrogate value for steel used in the 8th

administrative review, U.S. prices at least for TMC's bars/wedges

also declined."). Thus, even if normal value did decrease

between the eighth and thirteenth reviews, Commerce argues that

the margin would not necessarily be smaller, because the U.S.

price also declined.

Finally, the Department claims that plaintiffs' charts

themselves undermine their theory of a direct correlation between

steel values and margins. Specifically regarding TMC, Commerce

notes that the company's margin declined at a much steeper rate

than its steel surrogate value did from the eighth to the ninth

to the tenth administrative review. *See id*. at 10 ("While the

surrogate value of steel declined from the 8th administrative

review value of 37.52 Rs/kg to a range of values between 5.43

Rs/kg and 9.327 Rs/kg, the [calculated] margins declined at a

much steeper rate: from [a calculated rate of] 139.31 percent in

the 8th administrative review to [calculated rates of] 0.56

percent and 0.48 percent in the 9th and 10th administrative

reviews, respectively."). As a result, the Department contends

that something other than the surrogate values for steel alone

influenced the size of TMC's margin.

     In support of its challenge to the Remand Results, TMC
states that the Department's 139.31 percent rate is unreliable
because Commerce "merely selected data to support that conclusion
without meaningful and required corroboration."  Comments on the
Department of Commerce's Final Results of Redetermination
Pursuant to Court Remand ("Pls.' Supplemental Comments") 5.
Central to TMC's various claims is its contention that Commerce
refuses to acknowledge "how important it is to match the input
steel surrogate values with reasonable margins."  Pls.'
Supplemental Comments 10.

     TMC relies heavily on its contention that the steel
surrogate value chosen for the eighth administrative review was
"aberrational in comparison to all other input steel surrogate
values."  Pls.' Supplemental Comments 8.  In other words, the
company claims that the steel surrogate value used for the eighth
review was markedly more expensive than in other years, because
in the eighth review Commerce chose a specific Indian surrogate
steel value it had not used before, and that it has not used
since.  According to TMC, this surrogate value choice resulted in
a much higher antidumping margin in the eighth review than in
subsequent reviews.  To support their argument, plaintiffs
present the two charts, described *supra*, purporting to
demonstrate "that the calculated margins for TMC and Huarong
during the [eighth through thirteenth reviews] varied in direct

proportion to the steel input surrogate value."  Pls.'

Supplemental Comments 9.

Commerce's selection of the 139.31 percent rate for TMC's

sales of bars/wedges during the POR is sustained.  In reaching

this decision, the court notes that many of the arguments made in

this case were made in the earlier *Shandong* case, where this

Court sustained the 139.31 percent rate for TMC's sales of

bars/wedges in the twelfth administrative review.  In that case,

the Court stressed that all of TMC's proffered sales data were

tainted by the company's participation in the fraudulent

invoicing scheme.  *See Shandong*, 31 CIT at 1819–20 ("Because of

TMC's participation in the invoicing scheme, all of its sales

data was necessarily tainted. . . . Accordingly, despite

plaintiffs' insistence that Commerce should calculate a rate for

TMC's bars/wedges, Commerce had no reliable information from

which to do so.").

As an initial matter, Commerce's AUV analysis tends to

support its contention that "TMC's declining United States sales

values (without commensurate production process changes)

constituted probative evidence of TMC's continued dumping of hand

tools on the United States market."  Def.'s Resp. to Court's

Letter Dated June 11, 2010 3 (emphasis removed).  As the

Department explains:

> A direct relationship exists between an
> industry's production process and the subject

>            merchandise's cost of production because
>            significant changes in the production
>            process, such as the introduction of new
>            technology, can affect the cost of
>            production.  Hypothetically, if the cost of
>            production decreases because of new
>            technologies or efficiencies, such cost
>            decreases could be reflected in declining
>            United States sales values.  If no such
>            changes occurred, however, this would be some
>            indication that costs may have remained
>            steady, corroborating, to the extent
>            practicable, the selected facts available
>            dumping margin because declining sales values
>            reflected continued dumping.  Accordingly,
>            Commerce in this case examined whether
>            changes in the industry's production process
>            might have explained some of the decline in
>            U.S. sales values, and found that there were
>            no significant changes in the production
>            process of the industry.  Therefore, Commerce
>            reasonably determined that any change in the
>            cost of production for the subject
>            merchandise and the United States sales
>            values was not attributable to changes in the
>            production process of the industry.

Def.'s Resp. to Court's Letter Dated June 11, 2010 1—2.  While

the analysis does not take into account any changes in the

surrogate cost of manufacturing inputs, it is, as Commerce puts

it, "some indication" that TMC's manufacturing costs remained

steady while its U.S. price declined, thus eliminating production

changes as a cause of the change in price.

     Moreover, TMC has a history of significant rate changes

among reviews.  That is, the company has received calculated

rates that vary from 139.31 percent in the eighth, to 0.48

percent in the tenth review.  Thus, while TMC's more recent rates

have been dramatically lower, the calculated rate of 139.31

percent tends to confirm the Department's finding that assigning
this rate in this thirteenth review is not inconsistent with
TMC's calculated rate history.  *See Shandong*, 31 CIT at 1820.

TMC's primary objection to Commerce's analysis is that the
Department has failed to recognize the significance of
differences, across reviews, of the steel surrogate value to the
resulting margin.  At the outset, it must be noted that
Commerce's claim that it can ignore plaintiff's charts based on
the use of total AFA overstates the uses of 19 U.S.C. § 1677e(b).
*See, e.g.*, *Gerber Food (Yunnan) Co., Ltd. v. United States*, 29
CIT 753, 771, 387 F. Supp. 2d 1270, 1286-87 (2005) ("Commerce
failed to provide a rational explanation of how Green Fresh's
participation in the export agency agreement, and the
circumstances surrounding its reporting of that agreement,
affected the unrelated information needed to calculate an
antidumping duty rate for application to all shipments by Green
Fresh of mushrooms subject to the administrative review.").  Put
another way, the use of AFA resulting from the fraudulent
invoicing scheme may taint TMC's pricing information, but cannot
be used as an excuse to disregard unrelated information.  *See* 19
U.S.C. § 1677e(b).

TMC's arguments about the differences in the type of steel
used as an input in various reviews and hence its cost, however,
are not persuasive.  The data found in plaintiffs' charts only

considers one component of the normal value calculation, i.e.,
the input for steel.  Without looking at all the factors of
production together, e.g., the cost of labor, the court has no
way to discover if the reduction in the cost of the steel
surrogate value would have reduced TMC's margin.  In addition,
while the cost of producing the merchandise may have decreased
from review to review, so did the U.S. price.  Thus, it is not at
all clear that TMC's margin between the eighth and the thirteenth
review would have decreased based solely on a reduction in the
surrogate value of the steel inputs.[6]

Next, an examination of TMC's charts reveals that they do no
show a direct correlation between the steel surrogate value and
antidumping margin.  According to the charts, TMC's margin
decline was much more exaggerated than the decline in its steel
surrogate values between the eighth, ninth, and tenth reviews.
Therefore, the data suggests that factors other than the cost of
the steel input were at work and resulted in declining prices.

Here, the Department has chosen a rate calculated for TMC in
a prior review.  Reliance on a previously calculated rate for the
company itself was reasonable because, although the Department
had no reliable pricing information for the POR, it was able to

---

[6]      "While plaintiffs seem to claim that the surrogate values
that would have been used in the 13th administrative review would
have been lower than the surrogate value for steel used in the
8th administrative review, U.S. prices at least for TMC's
bars/wedges also declined."  Supplemental Remand Results at 8–9.

look to a rate arrived at using TMC's own verified data in an

earlier review.  *See Shandong*, 31 CIT at 1820.  The Department

then took steps to demonstrate that the data remained relevant to

the "commercial reality" of TMC during the thirteenth

administrative review.  *Gallant Ocean (Thailand) Co., Ltd. v.*

*United States*, 602 F.3d 1319, 1324 (Fed. Cir. 2010) (*"Gallant*

*Ocean"); see also KYD, Inc. v. United States*, 607 F.3d 760, 767

(Fed. Cir. 2010) (reaffirming *Gallant Ocean*'s "commercial

reality" test) (*"KYD"*).

     Specifically, Commerce (1) engaged in an AUV analysis to

demonstrate that a rate calculated using TMC's data from the

thirteenth review could have been as high or higher than 139.31

percent, and (2) employed a volatility analysis to show that

TMC's rates have varied greatly in past reviews, and that the

139.31 percent rate, though high, is consistent with TMC's rate

history.  In the AFA context, Commerce is permitted to add a

"built-in increase intended as a deterrent to non-compliance," as

long as that increase does not become "punitive, aberrational, or

uncorroborated."  *F.lli De Cecco Di Filippo Fara S. Martino*

*S.p.A. v. United States,* 216 F.3d 1027, 1032 (Fed. Cir. 2000)

(*"De Cecco"*).  By using a previously calculated rate for TMC

itself and justifying the rate with substantial evidence, it is

apparent that Commerce has not selected an "unreasonably high

rate[] having no relationship to the respondent's actual dumping

margin." *Gallant Ocean*, 602 F.3d at 1323.  Thus, Commerce has

satisfied the instructions in *Tianjin I* to "explain . . . how the

139.31 percent rate applied to TMC's . . . sales of bars/wedges

is a reasonably accurate estimate of TMC's actual rate with a

built-in increase to deter non-compliance . . . ."  *Tianjin I*, 31

CIT at 1435.  While hardly overwhelming, taken as a whole, the

Department has martialed sufficient substantial evidence to

support the rate. *See Shandong Huarong Gen. Corp. v. United*

*States*, 25 CIT 834, 842, 159 F. Supp. 2d 714, 722–23 (2001).

Accordingly, the court finds that Commerce's weighing of the

evidence and deriving inferences therefrom was not unreasonable

and sustains the Department's application of the 139.31 percent

rate to TMC's sales of bars/wedges in this thirteenth

administrative review.


    B.  Huarong

    In *Tianjin I*, the court found that in applying TMC's 139.31

percent rate from the eighth review to Huarong, the Department

did not "articulate[] how the 139.31 percent rate is a reasonable

estimate of what Huarong's rate would have been had it complied

together with a built-in increase as a deterrent," and,

therefore, directed Commerce to "explain in detail how any rate

assigned to Huarong is reliable and bears a rational relationship

to the company itself."  31 CIT at 1435.

On remand, the Department insists that the volatility of Huarong's margins in past reviews provides factual support for the relevance of the 139.31 percent rate to the company.  First Remand Results at 11; Supplemental Remand Results at 11.

Specifically, the Remand Results state that: (1) in the sixth review, Huarong received a calculated rate of 34.00 percent; (2) in the seventh review, a calculated rate of 1.27 percent; (3) in the eighth review, a calculated rate of 27.28 percent; (4) in the ninth review, an assigned AFA rate of 47.88 percent; (5) in the tenth review, a calculated rate of 18.99 percent; (6) in the eleventh review, a calculated rate of 30.02 percent; and, (7) in the twelfth review, Huarong was assigned the 139.31 percent AFA rate.[7]  *See* First Remand Results at 11.  For Commerce, these "wide swings" justified the continued relevance of the 139.31 percent rate to Huarong.  First Remand Results at 11.  The Department maintains this position even though Huarong has never had a calculated rate higher than 30.02 percent.

In addition, the Department examined Huarong's sales data from the eleventh review (in which the company cooperated and received its highest calculated rate of 30.02 percent) in order to demonstrate the relevance of the 139.31 percent to Huarong's sales during this POR.  First Remand Results at 11–12; Supplement Remand Results at 11.  In doing so, the Department noted that

---

[7]    Huarong's rate for the twelfth review was not judicially reviewed.

Huarong had some transaction-specific margins in the eleventh

review that were nearly as high as 139.31 percent and claims that

those transactions did "not appear to be aberrant or unusual in

any way."  First Remand Results at 12.[8]  For the Department,

these transactions were "representative of the margins [it] would

have calculated for . . . [Huarong] in the thirteenth review

(with a built-in incentive to encourage cooperation) had it not

received total AFA."  First Remand Results at 12.   In other

words, the Department claims that the 139.31 percent rate is

shown to be relevant to Huarong's commercial activity during the

POR by looking only at the high end of a selected group of sales

for a time period two years removed from the POR.  For Commerce,

this analysis was significant because it not only relied upon

Huarong's relatively recent data, but also served to support a

rate high enough to deter future non-cooperation.

Finally, the Department asserts "that if an uncooperative

respondent could have demonstrated that its dumping margin is

lower than the highest prior margin[,] it would have provided

information showing the margin to be less."  First Remand Results

at 12—13 (citation omitted).  To justify this approach, the

---

[8]     The Department examined 447 transactions from the eleventh
review.  None were as high 139.31 percent, and only twelve, or
roughly .03 percent of the transactions, were above 130 percent.
In addition, only fifty-two of the sales, or approximately twelve
percent of the sample, rose above one hundred percent.  More than
seventy-five percent of sales had less than a fifty percent
margin.  First Remand Results at App. 3.

Department relies on the "common sense" presumption first

confirmed by the Federal Circuit in *Rhone Poulenc, Inc. v. United*

*States*, 899 F.2d 1185 (Fed. Cir. 1990) ("*Rhone Poulenc*").   *See*

First Remand Results at 12—13; *Rhone Poulenc*, 899 F.2d at 1190.

Huarong's arguments in response to Commerce's conclusions

concerning Huarong are not entirely dissimilar to those made by

TMC.   Thus, the company asserts that there is a direct

correlation between the surrogate steel values from its various

reviews and its calculated antidumping margins.   Pls.'

Supplemental Comments 9.   Moreover, Huarong insists that Commerce

did not comply with the court's remand instruction to explain how

TMC's prior rate is rationally related to Huarong.   The company

argues that the Department's analysis was "inadequate and

selective," and that Commerce "improperly used TMC's prior rate

as a benchmark for Huarong."   Comments on the Dept. of Commerce's

Final Results of Redetermination Pursuant to Court Remand ("Pls.'

First Comments") 25.   Additionally, Huarong claims that

Commerce's volatility analysis does not provide substantial

evidence that Huarong should receive a 109.29 percentage point

increase from its last calculated rate in the eleventh review.

Pls.' First Comments 28.   It also notes that this Court

invalidated the 139.31 percent AFA rate for Huarong in the ninth

review.   Pls.' Supplemental Comments 14; *see also Shandong*

*Huarong Gen. Grp. Corp. v. United States*, 29 CIT 1227, 1237

(2005) (not reported in the Federal Supplement) ("*Huarong*")
(characterizing the use of the 139.31 percent rate in the ninth
review as "punitive in nature" based on Commerce's "strained
efforts to demonstrate [its] validity").

Although the court finds Huarong's arguments concerning the
correlation between steel surrogate values and its antidumping
margins unconvincing for the same reasons set out in the TMC
discussion *supra*, the question of Huarong's rate must again be
remanded.  First, the court is not persuaded by the Department's
citation of *Rhone Poulenc* for the idea that the use of AFA
dispenses with the Department's statutory mandate to corroborate
secondary information.  *See* 19 U.S.C. § 1677e(c).  The *Rhone
Poulenc* case is most often cited for its statement on the
assignment of the highest prior margin to an uncooperative
respondent: "[I]t reflects a common sense inference that the
highest prior margin is the most probative evidence of current
margins because, if it were not so, the importer, knowing of the
rule, would have produced *current* information showing the margin
to be less."  *Rhone Poulenc*, 899 F.2d at 1190.  In other words,
the case stands for the proposition that a respondent can be
assumed to make a rational decision to either respond or not
respond to Commerce's questionnaires, based on which choice will
result in the lower rate.

It is important to keep in mind, however, that *Rhone Poulenc*

was a pre-Uruguay Round Agreements case.  As a result, it

reflected the state of the law prior to the enactment of the Act[9]

that implemented the Agreements' negotiated terms.  *See generally*

*Gerber Food (Yunnan) Co., Ltd. v. United States*, 31 CIT 921, 947,

491 F. Supp. 2d 1326, 1351 (2007) ("*Rhone Poulenc* . . . involved

the application of the 'best information available' standard

under 19 U.S.C. § 1677e prior to the substantial amendment of

that statutory provision by the Uruguay Round Agreements Act . .

. .").  As part of the implementing legislation, however,

Congress directed Commerce to make additional findings in AFA

cases.  *See* 19 U.S.C. § 1677e(c) ("When the administering

authority or the Commission relies on secondary information

rather than on information obtained in the course of an

investigation or review, the administering authority or the

Commission, as the case may be, shall, to the extent practicable,

corroborate that information from independent sources that are

reasonably at their disposal.").  It appears that Commerce is now

trying to dispense with this corroboration requirement by

employing the *Rhone Poulenc* presumption.  Because the case

predated the Uruguay Round Agreements Act additions to § 1677e,

however, it necessarily did not hold that the presumption could

---

[9]     The Uruguay Round Agreements Act, Pub. L. No. 103-465, 108
Stat. 4809 (1994), changed United States law to conform to the
provisions agreed upon at the Uruguay Round of negotiations of
the General Agreement on Tariffs and Trade.

replace actual corroboration.

In addition, in the most recent cases where the presumption is mentioned, the Federal Circuit appears to restrict its use to situations where a respondent has not answered Commerce's questionnaire at all, rather than when the questionnaire responses were found wanting for one reason or another.  In fact, in the most recent case citing the *Rhone Poulenc* presumption, the Federal Circuit paid particular attention to the fact that the exporter put nothing on the record.  *See KYD*, 607 F.3d at 764 ("King Pac had elected not to cooperate at all in the review."); *see also id.* at 767 ("King Pac's failure to cooperate deprived Commerce of the most direct evidence of King Pac's actual dumping margin.").  Thus, the *KYD* case seems to confirm that "common sense" restricts the *Rhone Poulenc* presumption to cases where a respondent can be assumed to have chosen not to respond to a questionnaire at all, in order to achieve a lower rate.

Furthermore, the Federal Circuit recently analyzed the outer limits of Commerce's discretion in assigning AFA rates.  In *Gallant Ocean*, the plaintiff was a Thai exporter of shrimp that refused to participate in an administrative review.  *Gallant Ocean*, 602 F.3d at 1321–22.  Having no company-specific information to use, Commerce assigned Gallant a 57.64 percent AFA rate, based on the petition rate.  Commerce claimed that the rate was corroborated by transaction-specific margins for three other

cooperating exporters. *Id.* at 1322. The rate, however, was ten
times higher than the average rate for all cooperating
respondents and five times higher than the highest rate
calculated for any cooperating respondent. *Id.* at 1324. The
Federal Circuit rejected Commerce's chosen rate because "nothing
in the record tie[d] the . . . rate to Gallant," making the rate
"unrelated to [Gallant's] commercial activity." *Id.* In
addition, the *Gallant Ocean* Court characterized the rate as
"'punitive, aberrational, or uncorroborated'" because of the
large disparity between the assigned rate and the cooperative
respondents' calculated dumping rates. *Id.* (quoting *De Cecco*,
216 F.3d at 1032). On remand, the Court instructed Commerce that
it "must select secondary information [i.e., a rate] that has
some grounding in [Gallant's] commercial reality." *Id.*

     In the subsequent *KYD* case, the Federal Circuit reaffirmed
the "commercial reality" requirement. *See KYD*, 607 F.3d at 767
("Moreover, in *Gallant Ocean* this court concluded that the AFA
margin that Commerce selected 'did not and does not represent
commercial reality' and ruled that Commerce 'may not use the
petition rate to establish the dumping margin when its own
investigation revealed that the petition rate was not
credible.'"). Thus, *KYD* and *Gallant Ocean*, taken together,
confirm that an AFA rate must be shown by substantial evidence to
have a rational relationship to the "commercial reality" of the

respondent during the POR.

Other Federal Circuit AFA decisions bolster the conclusion that Commerce must establish the relevance of a chosen rate to the respondent. In *De Cecco*, the court stressed that Commerce's discretion is "not unbounded" and that "Congress could not have intended for Commerce's discretion to include the ability to select unreasonably high rates with no relationship to the respondent's actual dumping margin." 216 F.3d at 1032. In particular, the *De Cecco* Court noted that "the statute has no requirement that Commerce is limited to the highest rate imposed on a cooperating company when selecting a rate for a non-cooperating respondent." *Id.*

The Federal Circuit did uphold an AFA rate corroborated by a small percentage of a company's transactions in *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1340 (Fed. Cir. 2009) ("*PAM*"). The Court, however, discussed *PAM* in *Gallant Ocean*, noting that "[s]ubstantial evidence [still] requires Commerce to show some relationship between the AFA rate and the actual dumping margin" of the company being reviewed. *Gallant Ocean*, 602 F.3d at 1325. The *Gallant Ocean* Court emphasized that an analysis of selected transactions was not sufficient to constitute substantial evidence of what a calculated rate would be when "a large body of reliable information suggest[s] the application of a much lower margin." *Id.; see also id.* at 1324 ("Commerce used a very small

percentage of the mandatory respondents' transactions as

corroborative evidence even though most transactions during the

period of review had significantly lower dumping margins.").

Here, Commerce's justifications recall the Department's

reasoning in the litigation following the final determination in

the ninth administrative review, where the Department also

selected the 139.31 percent AFA rate for Huarong.  *Huarong*, 29

CIT at 1230.  As in this case, in *Huarong*, Commerce relied on

volatility and a limited number of transaction-specific margins

to justify the same 139.31 percent rate.  *Id*. at 1233—35.  The

*Huarong* Court noted, however, that "[w]hile changes in

antidumping duty rates from one review to the next may be

consistent with the 'volatile nature' of the rates for

bars/wedges, Commerce has still failed to demonstrate the

validity of such a large absolute increase."  *Id*. at 1233.  That

is, the jump from calculated rates ranging from 1.27 percent to

34.00 percent to a 139.31 percent AFA rate needed a thorough

explanation backed by substantial evidence.  Thus, the *Huarong*

Court concluded that "Commerce has failed to justify the 139.31%

rate with substantial evidence" and found the rate to be

"punitive in nature."  *Id*. at 1237; *see also id*. ("[T]he court

finds that Commerce has failed to justify the 139.31% rate

assigned to the Companies, and further finds that the rate is

punitive . . . .").  Since it had remanded the case twice, the

Court directed Commerce "to no longer employ [the 139.31 percent]
rate." *Id.* Commerce then selected a 47.88 percent rate on the
third remand. The *Huarong* Court found that Commerce had finally
"explained adequately the reliability and relevance of the . . .
AFA rate" by selecting a rate that was 13.88 percent higher than
Huarong's previous highest calculated rate in order to encourage
future compliance. *Shandong Huarong Gen. Grp. Corp. v. United
States*, 31 CIT 42, 45—46 (2007) (not reported in the Federal
Supplement).

     Based on the foregoing, it is clear that Commerce has again
failed to support with substantial evidence the 139.31 percent
rate for Huarong. In choosing an AFA rate on remand, Commerce
must select one grounded in the "commercial reality" of the
company under review during the POR. Commerce has failed to do
so here. First, the volatility argument for Huarong is weak,
considering that the company has never had a calculated rate
anywhere near 139.31 percent. That is, Huarong's calculated
rates in earlier reviews varied from 1.27 percent to 34.00
percent. Thus, while Huarong has had various calculated rates,
none has approached the rate assigned by Commerce.

     Moreover, considering the persuasive evidence represented by
these lower calculated rates, Commerce's decision to look only at
selected sales to justify a rate over one hundred points higher
than Huarong's highest calculated rate does not constitute

substantial evidence of what Huarong's calculated rate would have

been.  *See, e.g., Gallant Ocean*, 602 F.3d at 1325 (stating that

"a small percentage of . . . transactions [does not] represent[]

a reasonably accurate estimate of Gallant's actual dumping

margin" when "a large body of reliable information suggest[] the

application of a much lower margin.").  This is particularly the

case where an examination of Commerce's analysis reveals that the

Department looked at 447 transactions, of which 395 (or roughly

eighty-eight percent) had margins of less than one hundred

percent, while over 75 percent of the sample had margins below

fifty percent.  First Remand Results at App. 3.

     As this Court recently noted, to "avoid imposition of a

punitive rate," the court must consider whether "the AFA rate

[is] so far from what has been demonstrated by actual rates . . .

that it must be rejected."  *Qingdao Taifa Grp. Co., Ltd., v.*

*United States*, 34 CIT __, __, Slip Op. 10-126 at 12, 11 (Nov. 12,

2010).  Furthermore, this Court has held that more than doubling

a previously-determined AFA rate "must necessarily be punitive."

*Shandong Mach. Imp. & Exp. Co. v. United States*, 34 CIT __, __,

Slip Op. 10-88 at 10 (Aug. 11, 2010).  Thus, a rate that is over

one hundred percentage points higher and more than four times

greater than Huarong's highest previously calculated rate, as

well as a rate dramatically higher than the vast majority of

specific transactions Commerce looked at, renders Commerce's

choice "punitive in nature" based on Commerce's "strained efforts
to demonstrate [its] validity." *Huarong*, 29 CIT at 1237. *See
also De Cecco*, 216 F.3d at 1032 (affirming the rejection of a
punitive AFA rate that "was many times higher than [the
company's] actual dumping margin").

Because the court finds that Commerce has failed to justify
with substantial evidence the 139.31 percent rate after having
had two previous opportunities to do so, and further finds that
the rate is punitive, the Department is directed, on remand, to
no longer employ this rate and to choose a lower rate.
Therefore, Commerce shall choose and support, with substantial
evidence, one of the following: (1) a calculated rate from a
previous review, that reflects the actual rate during the POR,
with a built-in increase to deter non-compliance; or (2) reopen
the record and calculate a rate that accurately reflects what the
rate would have been had Huarong cooperated, with a built-in
increase as a deterrent to non-compliance.


II.  AFA Rate for TMC's Sales of Picks/Mattocks

In *Tianjin I*, the court found unsupported by substantial
evidence Commerce's selection, as the AFA rate for TMC's sales of
picks/mattocks, a 98.77 percent rate calculated in the fifth
review for a different respondent, Funjian Machinery Import and
Export Corp. ("FMEC"). 31 CIT at 1437—38; Pls. First Comments

34.  Commerce applied AFA to TMC's sales of picks/mattocks "based

on the company's failure to have available for inspection at

verification its sole supplier's factors of production data."

*Id.* at 1437.  The court found that Commerce's justification that

the rate was "calculated for another respondent in a prior

segment of these proceedings" was "not sufficient for the court

to find that the selected rate was a reasonably accurate

reflection of what TMC's actual rate would be during the POR,"

together with a built-in increase to deter non-compliance.  *Id.*

The court remanded the issue to the Department with instructions

to:

> (1) explain (a) how the 98.77 percent rate
> for TMC's picks/maddocks is a reasonably
> accurate estimate of TMC's actual rate with a
> built-in increase to deter non-compliance;
> and (b) why it did not select as an AFA rate
> for TMC's sales of picks/mattocks one of the
> previously assigned lower rates, albeit with
> a built-in increase to deter future
> non-compliance; or (2) reopen the record and
> obtain evidence to support an actual
> calculated rate for TMC's sales of
> picks/mattocks.

*Id.* at 1438.

On remand, the Department claims that it did not reopen the

record.  Nonetheless, it did place on the record additional

factual support in an effort to demonstrate that the 98.77

percent rate was relevant to TMC.  Specifically, Commerce

analyzed the company's sales in the twelfth review and found that

TMC had transaction-specific margins in that review that were

considerably above 98.77 percent.[10]   First Remand Results at 14.

The Department added:

> We also compared the [twelfth review]
> transactions that approximate the proposed
> AFA rate of 98.77 percent to other U.S. sales
> of [picks/mattocks] made by TMC.  The U.S.
> transactions corroborating the AFA rate do
> not appear to be aberrant or unusual in any
> way.  They appear to be made in commercial
> quantities.  Because we are making an adverse
> inference with regard to TMC, we regard these
> transactions as representative of the margins
> we would have calculated for this company in
> the thirteenth review (with a built-in
> incentive to encourage cooperation) had it
> not received total AFA.

*Id.*

In addition, as in its bars/wedges analysis, Commerce relies

on the *Rhone Poulenc* presumption to corroborate the 98.77 percent

rate.  *Id.* at 15.  Commerce argues that if TMC could have

demonstrated that its rate would have been lower than the highest

previous margin, it would have provided such information.

Further, to explain why the Department did not select one of

TMC's previously assigned lower rates as an AFA rate, the

Department maintains that it has discretion to choose the

information on which it relies.  *Id.* at 15.  ("Because TMC's

sales of picks/mattocks are receiving total AFA because it could

not provide factors of production information, we do not find

that using one of TMC's prior rates would be appropriate as an

---

[10]    The First Remand Results cites two sales with a margin of
363.91 percent.  First Remand Results at 14.

AFA rate.  In administrative reviews where TMC received
calculated rates, TMC fully participated in those proceedings and
received a calculated rate based on its own data.  As a result,
it would be inappropriate to apply a lower rate to TMC as AFA in
this review.").

For TMC, Commerce has still not demonstrated the reliability
nor the relevance of the rate to the company.  TMC argues that
using a different company's rate from a review almost a decade
removed from the POR is not reflective of TMC's commercial
activity during the POR.  Pls.' First Comments 35.

In addition, TMC claims that the Department has not
adequately explained why it did not select one of TMC's
previously assigned lower rates and add to it a built-in increase
for non-compliance.  More specifically, TMC notes that the
highest prior margin for a review in which TMC fully participated
was 4.76 percent, and that 4.76 percent should have been the
starting point for a margin in this case, plus an addition to
deter future non-compliance.  *See* Pls.' First Comments 39.

The court is not persuaded that Commerce has supplied the
substantial evidence to sustain the 98.77 percent AFA rate for
TMC's sales of picks/mattocks.  First, as TMC argues, "nothing in
the record ties the . . . rate to" TMC, as Commerce chose a rate
calculated for a different party in a completely different
review.  *See Gallant Ocean*, 602 F.3d at 1324.  By not using a

rate calculated for TMC, but rather one calculated for another
company, Commerce must produce evidence that this rate is
relevant to TMC.  "Although Commerce has discretion in choosing
from a list of secondary information to support its adverse
inferences, Commerce must select secondary information that has
some grounding in commercial reality."  *Id.*

Second, Commerce's analysis of a small fraction of TMC's
sales in a time period outside of the POR does not constitute
substantial evidence that FMEC's rate from another POR was
relevant to TMC during the POR.  This is because the selected
sales from the twelfth review simply do not corroborate a rate of
98.77 percent.  Of the twenty-two sales Commerce examined, only
two had a margin in excess of 98.77 percent, and those margins
were for only one of the six products included in the analysis.
Furthermore, fourteen of the twenty-two sales showed no dumping,
and the six other sales had margins close to zero.  First Remand
Results at App. 4.  Thus, the selected sales do not constitute
substantial evidence, or indeed very much evidence at all, that
TMC's margin during the POR was anything approaching 98.77
percent.

While the Department has been sustained in its use of a
small number of sales to corroborate rates in the past, the
manner in which these sales were used in this case distinguishes
it from cases like *Ta Chen* and *PAM*.  For instance, in *Ta Chen*,

Commerce used the company's "sales data from the relevant review period." *Gallant Ocean*, 602 F.3d at 1324. Thus, the rate was corroborated by Ta Chen's own sales for the POR. Furthermore, as the Federal Circuit noted in *Gallant Ocean*, "[u]nlike *PAM*, Commerce in the present [*Gallant Ocean*] case did not show that a small percentage of the mandatory respondents' transactions represented a reasonably accurate estimate of Gallant's actual dumping margin." *Id*. at 1325. That is, in *PAM*, the Federal Circuit found that "in view of the entire record, . . . the transactions were reasonably tied to PAM's actual dumping margin." *Id*. Such is not the case here where the selected transactions point to a substantially lower rate than the one assigned.

Moreover, as TMC also emphasizes, there is an even wider gulf here than in *Gallant Ocean* between the AFA rate for this review and TMC's previous non-AFA rates. TMC's highest previous calculated rate was 4.76 percent. The rate chosen here is ninety-four percentage points greater than the highest calculated rate for TMC and almost twenty times greater than that rate. This disparity, together with Commerce's failure to cite any serious evidence corroborating it, is enough for the court to conclude that the 98.77 percent AFA rate chosen by Commerce is aberrational and punitive. *See id*. at 1324 (stressing the difference between cooperating respondents' actual dumping

margins of 2.58 to 10.75 percent and Gallant's AFA rate of 57.64

percent). Although Commerce insists that it could not use one of

TMC's previous rates as a baseline because none of them were AFA

rates, that argument does not justify Commerce's selection of a

punitive rate. *See also Huarong*, 29 CIT at 1237 (finding a

139.31 percent AFA rate punitive when the highest prior rate was

34.00 percent).

It is also worth noting that Commerce's reliance on *Rhone

Poulenc* in this context continues to be misplaced. First, as

noted, the *Rhone Poulenc* presumption does not excuse Commerce

from corroborating secondary evidence as required by statute.

Second, no common sense inference can be drawn from TMC's making

the effort to answer Commerce's questionnaires and then being

unable to produce its supplier's records at verification because

they were seized by local authorities.

Because the court finds that Commerce has twice failed to

produce substantial evidence demonstrating the relevance of the

98.77 percent rate to TMC during the POR, and because it further

finds that the rate is punitive, Commerce is directed upon remand

to no longer employ this rate and to choose a lower rate. On

remand, Commerce must choose an AFA rate based on the "commercial

reality" of TMC's sales of picks/mattocks. Therefore, Commerce

shall choose and support, with substantial evidence, one of the

following: (1) select a calculated rate from a previous review,

that reflects TMC's actual rate during the POR, with a built-in

increase to deter non-compliance; or (2) reopen the record and

calculate a rate that accurately reflects what the rate would

have been had TMC cooperated, with a built-in increase as a

deterrent to non-compliance.

CONCLUSION

For the foregoing reasons, Commerce's First Remand Results

and Supplemental Remand Results are sustained in part and

remanded.  The remand results shall be due on May 4, 2011;

comments to the remand results shall be due on June 3, 2011; and

replies to such comments shall be due on June 17, 2011.

/s/ Richard K. Eaton<br>Richard K. Eaton

Dated: January 4, 2011<br>
      New York, New York