Slip Op. 12-83

UNITED STATES COURT OF INTERNATIONAL TRADE

_____  :
                                     :
TIANJIN MACHINERY IMPORT &           :
EXPORT CORP. and SHANDONG            :
HUARONG MACHINERY CO., LTD.,         :
                                     :
        Plaintiffs,                  :
                                     :
              v.                     :     Before: Richard K. Eaton, Judge
                                     :
UNITED STATES,                       :     Court No. 05-00522
                                     :
        Defendant,                   :     **Public Version**
                                     :
              and                    :
                                     :
AMES TRUE TEMPER,                    :
                                     :
        Defendant-Intervenor.        :
_____  :

OPINION

[The Final Results are sustained.]

Dated: June 14, 2012

*Hume & Associates LLC* (*Stephen M. De Luca and Robert T. Hume*), for plaintiffs.

*Tony West*, Assistant Attorney General; *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, Civil Division, Commercial Litigation Branch, United States Department of Justice (*Michael D. Panzera*); Office of the Chief Counsel for Import Administration, United States Department of Commerce (*Shana Hofstetter*), of counsel, for defendant.

*Wiley Rein LLP* (*Timothy C. Brightbill and Maureen E. Thorson*), for defendant-intervenor.

Eaton, Judge:  At issue in this case are the Final Results of Redetermination following a

second remand of the Department of Commerce's ("Commerce" or the "Department") Final

Results of the Thirteenth Administrative Review of four antidumping duty orders applicable to

imports into the United States of heavy forged hand tools ("HFHTs") from the People's Republic

of China ("PRC").  *See Final Results of Redetermination Pursuant to Court Order* (Dep't of

Commerce May 4, 2011) (ECF Docket No. 146) ("Second Remand Results"); *see also Tianjin

Mach. Imp. & Exp. Corp. v. United States*, 35 CIT __, 752 F. Supp. 2d 1336 (2011) (*Tianjin III*);

Final Results of Redetermination Pursuant to Court Order (Dep't of Commerce Sept. 16, 2009)

(ECF Docket No. 116) ("First Remand Results"); *Tianjin Mach. Imp. & Exp. Corp. v. United

States*, 31 CIT 1416 (2007) (not reported in the Federal Supplement) (*Tianjin I*); HFHTs, Finished

or Unfinished, With or Without Handles, From the PRC, 70 Fed. Reg. 54,897 (Dep't of Commerce

Sept. 19, 2005) (final results of antidumping duty administrative reviews) ("Final Results");

HFHTs, Finished or Unfinished, With or Without Handles, From the PRC, 56 Fed. Reg. 6622

(Dep't of Commerce Feb. 19, 1991) (notice of antidumping duty orders).  The period of review

("POR") covers February 1, 2003 through January 30, 2004.

In *Tianjin III*, the court remanded the First Remand Results, directing Commerce to: (1)

redetermine the Adverse Facts Available ("AFA") rate applied to Shandong Huarong Machinery

Co.'s ("Huarong") sales of bars/wedges because Commerce had not sufficiently corroborated the

rate of 139.31%; and (2) redetermine the AFA rate of 98.77% applied to Tianjin Machinery Import

& Export Co.'s ("TMC") sales of picks/mattocks, which likewise was not sufficiently

corroborated by Commerce.  *Tianjin III*, 35 CIT at __, __, 752 F. Supp. 2d at 1350, 1353.

In these Second Remand Results, Commerce has determined a revised AFA rate of 47.88%

for Huarong's sales of bars/wedges and 32.15% for TMC's sales of picks/mattocks.[1]  Second

Remand Results 3.  The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B) (iii) (2006)

and 28 U.S.C. § 1581(c) (2006).

For the following reasons, the Second Remand Results are sustained.

## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."

19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

I.   Second Remand Results

On September 19, 2005, Commerce issued the Final Results of the Thirteenth

Administrative Review of antidumping orders on HFHTs from the PRC.  *See* Final Results, 70

Fed. Reg. at 54,897.  Thereafter, the court sustained Commerce's determination to apply AFA to

plaintiffs' merchandise because of an agent sales scheme,[2] but remanded the case to Commerce to

---

[1]       Commerce "conduct[ed] this remand under protest."  *See* Second Remand Results
3 n.2; *Viraj Grp., Ltd. v. United States*, 343 F.3d 1371 (Fed. Cir. 2003).

[2]       In *Tianjin I*, the Court found that "Commerce provided specific reasons for using
facts available in determining plaintiffs' margins for their claimed agent sales."  *Tianjin I*, 31 CIT
at 1421.  In addition, the Court found "reasonable Commerce's decision to determine plaintiffs'
dumping margins for their claimed 'agent' sales based on AFA."  *Id.* at 1422.  Specifically, the
Department found that (1) "plaintiffs misrepresented the nature of their business relationship

( continued . . . )

reconsider: (1) the AFA rate of 139.31% for bars/wedges applied to Huarong and TMC; and (2)

the AFA rate of 98.77% for picks/mattocks applied to TMC.  *See Tianjin I*, 31 CIT at 1417.[3]

Following this first remand, the court upheld Commerce's application of the AFA rate of

139.31% to TMC's sales of bars/wedges, but found that Commerce had not sufficiently

corroborated this rate as applied to Huarong.  Therefore, the matter was again remanded, and

Commerce was directed to

> choose and support, with substantial evidence, one of the following: (1) a
> calculated rate from a previous review, that reflects [Huarong's] actual rate during
> the POR, with a built-in increase to deter non-compliance; or (2) reopen the record
> and calculate a rate that accurately reflects what the rate would have been had
> Huarong cooperated, with a built-in increase as a deterrent to non-compliance.

*Tianjin III*, 35 CIT at __, 752 F. Supp. 2d at 1350.  The court likewise found that the AFA rate of

---

( . . . continued )

throughout the administrative review . . . [and] made it appear in their initial . . . responses that
their agent sales were made pursuant to a legitimate agency relationship"; and (2) both respondents
"failed to cooperate by not acting to the best of their ability to comply with [Commerce's] requests
for information."  *Id.* at 1421–22 (internal quotation marks and citations omitted).  Consequently,
the court found that "plaintiffs' 'failure initially to provide the relevant information with respect to
their invoicing arrangement, information that was fully within their command, justified
Commerce's application of AFA' to plaintiffs' claimed 'agent' sales."  *Id.* at 1424 (quoting
*Shandong Huarong Mach. Co. v. United States*, 30 CIT 1269, 1278, 435 F. Supp. 2d 1261, 1270
(2006)).

[3]      The court later ordered Commerce to reopen the record to consider new
information provided by plaintiffs on changes in steel surrogate values during different periods of
review, and the impact of these changes on antidumping margins.  *See* Court Order at 4, *Tianjin
Mach. Imp. & Exp. Corp. v. United States*, No. 05-00522 (June 8, 2009) (ECF Docket No. 112)
(*Tianjin II*) (directing Commerce to place plaintiffs' additional information on the record and to
offer a response to it).  On January 4, 2011, the court sustained Commerce's decision not to use
plaintiffs' new data.  *Tianjin III*, 35 CIT at __, 752 F. Supp. 2d at 1343.  Specifically, in *Tianjin III*,
the court stated, "[w]ith respect to the [new data] plaintiffs have now placed on the record, . . . the
Department believes, based on the companies' participation in the fraudulent [agent] scheme that
the new data, like all of the companies' questionnaire responses, is not reliable."  *Id.* at __, 752 F.
Supp. 2d at 1342.

98.77% as applied to TMC's sales of picks/mattocks was not sufficiently corroborated, and gave

Commerce instructions similar to those it had provided for Huarong's sales of bars/wedges.  *See*

*Tianjin III*, 35 CIT at __, 752 F. Supp. 2d at 1353.


II.    Legal Framework

        "Commerce periodically reviews and reassesses antidumping duties" that it imposes on

"imported merchandise that is sold in the United States below its fair value and materially injures

or threatens to injure a domestic industry."  *Gallant Ocean (Thai.) Co. v. United States*, 602 F.3d

1319, 1321 (Fed. Cir. 2010) (citing 19 U.S.C. §§ 1673, 1675(a)).  During such periodic reviews,

"Commerce requests information from the interested parties," *id.*, and if a respondent in a review

"significantly impedes a proceeding," Commerce is permitted to use "facts otherwise available" to

determine the rate, 19 U.S.C. § 1677e(a)(2)(C).  If Commerce further finds that a respondent has

"failed to cooperate by not acting to the best of its ability to comply with a request for

information," then the Department "may use an inference that is adverse to the interests of that

party in selecting from among the facts otherwise available."  19 U.S.C. § 1677e(b).  As noted, the

court has sustained Commerce's use of AFA based on an agent sales scheme.  *Tianjin I*, 31 CIT at

1422.

        When, as here, the record does not contain reliable information from which to calculate a

rate,[4] Commerce may determine one.  "[I]n the case of uncooperative respondents," Commerce

---

        [4]        Here, there was no reliable information on the record for Commerce to use to
calculate a rate because the Department lawfully rejected the financial information plaintiffs put
on the record.  Specifically, in *Tianjin I*, this court found "reasonable Commerce's decision to

                                                                          ( continued . . . )

has discretion to "select from a list of secondary sources as a basis for its adverse inferences."

*Gallant Ocean*, 602 F.3d at 1323; *see also F.lli De Cecco di Filippo Fara S. Martino S.p.A. v.*

*United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000); 19 U.S.C. § 1677e(b).  "'Commerce's

discretion in these matters, however, is not unbounded.'"  *Gallant Ocean*, 602 F.3d at 1323

(quoting *De Cecco*, 216 F.3d at 1032).  Commerce's discretion is restrained because the purpose of

the AFA statute "is to provide respondents with an incentive to cooperate, not to impose punitive,

aberrational, or uncorroborated margins."  *De Cecco*, 216 F.3d at 1032.  Therefore, "Congress

tempered the deterrent purpose with the corroboration requirement," *Gallant Ocean*, 602 F.3d at

1323, which requires that "[w]hen [Commerce] relies on secondary information[5] rather than on

information obtained in the course of an investigation or review, [Commerce] shall, to the extent

practicable, corroborate that information from independent sources that are reasonably at [its]

disposal,"[6] 19 U.S.C. § 1677e(c).

   "Corroborate means that [Commerce] will examine whether the secondary information to

be used has probative value."  19 C.F.R. § 351.308(d) (2011).  To corroborate its selection of an

---

( . . . continued )

determine plaintiffs' dumping margins for their claimed 'agent' sales based on AFA."  *Tianjin I*,
31 CIT at 1422.

   [5]      "Secondary information" is defined as "information derived from—(1) the petition,
(2) a final determination in the investigation under this subtitle, (3) any previous review under [19
U.S.C. § 1675] or determination under [19 U.S.C. § 1675b], or (4) any other information placed on
the record."  19 U.S.C. § 1677e(b)(1)–(4).

   [6]      "The Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809
(1994), changed United States law to conform to the provisions agreed upon at the Uruguay Round
of negotiations of the General Agreement on Tariffs and Trade," which resulted in the
corroboration requirement.  *Tianjin III*, 35 CIT at __, 752 F. Supp. 2d at 1347 n.9.

AFA rate, Commerce must therefore demonstrate that the rate is reliable and relevant to the

particular respondent.  *Gallant Ocean*, 602 F.3d at 1325 ("Substantial evidence requires

Commerce to show some relationship between the AFA rate and the [respondent's] actual

dumping margin."); *Mittal Steel Galati S.A. v. United States*, 31 CIT 730, 734, 491 F. Supp. 2d

1273, 1278 (2007) ("Commerce assesses the probative value of secondary information by

examining the reliability and relevance of the information to be used.").  Furthermore, "[i]n order

to corroborate an AFA rate, Commerce must show that it used 'reliable facts' that had 'some

grounding in commercial reality.'"  *Qingdao Taifa Grp. Co. v. United States*, 35 CIT __, __, 780 F.

Supp. 2d 1342, 1348 (2011) (quoting *Gallant Ocean*, 602 F.3d at 1324) (A "'reasonably accurate

estimate'" of a respondent's antidumping margin is one that is related to a respondent's

"commercial reality.")).  Hence, the corroboration requirement is designed to ensure that an AFA

rate is "a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in

increase intended as a deterrent to non-compliance."  *De Cecco*, 216 F.3d at 1032; *id.* at 1034 ("By

requiring corroboration of adverse inference rates, Congress clearly intended that such rates

should be reasonable and have some basis in reality.").


III.    Corroboration of the AFA Rate for Huarong's Sales of Bars/Wedges

        Pursuant to the court's instructions, on remand, Commerce reassessed its original 139.31%

AFA rate and assigned an AFA rate of 47.88%[7] for Huarong's sales of bars/wedges.  In doing so,

---

[7]        The final AFA rate of 47.88% had been calculated for Fujian Machinery &
Equipment Import & Export Corp.'s sales of bars/wedges in the 1992–1993 review.  Thereafter, it
was the country-wide rate in the Ninth Administrative Review (post-litigation), and was upheld by
this court as a lawful AFA rate for Huarong's sales of bars/wedges during that review.  Second

( continued . . . )

the Department selected the rate that was applied as an AFA rate to Huarong's sales of

bars/wedges after remand during the Ninth Administrative Review.  *Shandong Huarong Gen. Grp.*

*Corp. & Liaoning Mach. Imp. & Exp. Corp. v. United States*, 31 CIT 42, 49 (2007) (not reported in

the Federal Supplement).

Plaintiffs argue that the AFA rate for Huarong was not properly corroborated because it

does not reflect Huarong's commercial reality.  Pls.' Cmts. on Final Results of Redetermination 9

(ECF Docket No. 147) ("Pls.' Cmts.").  The Department, however, insists that the AFA rate of

47.88% properly reflects Huarong's "commercial reality," and was therefore relevant to the

company.  Second Remand Results 6 ("The Department has . . . sought to employ an AFA rate that

reflects 'commercial reality' as discussed in *Gallant Ocean* and *KYD*.").  Defendant-intervenor

Ames True Temper ("Ames") agrees "that the Department adequately corroborated this rate."

Def.-Int.'s Cmts. on Final Results of Redetermination 6 (ECF Docket No. 148) ("Def.-Int.'s

Cmts.") 6.

It is apparent that Commerce has sufficiently corroborated the 47.88% rate.  As an initial

matter, the rate is reliable because it was calculated from verified information for the respondent

Fujian Machinery & Equipment Import & Export Corp.'s sales of bars/wedges in the 1992–1993

review.  *See* Second Remand Results 5–6; Def.'s Resp. to Cmts. on Final Results of

Redetermination 3 (ECF Docket No. 152) ("Def.'s Resp.").

Next, "[t]o demonstrate how the 47.88 percent AFA rate is commercially relevant to

---

( . . . continued )

Remand Results 5–6; *Shandong Huarong Gen. Grp. Corp. & Liaoning Mach. Imp. & Exp. Corp.*
*v. United States*, 31 CIT 42, 44 (2007) (not reported in the Federal Supplement).

Huarong for the thirteenth administrative review, the Department examined the entire U.S. sales

database [of Huarong's sales of bars/wedges] from the eleventh review[8] consisting of 447

transactions, the most recent period in which Huarong received a calculated rate."[9]  Second

Remand Results 6.  In other words, Commerce analyzed the 447 individual transaction margins

calculated for Huarong's sales of bars/wedges, in the most recent review in which Huarong

received a calculated rate, in order to determine whether 47.88% was within the range of these

calculated transaction margins.  *See* Def.'s Resp. 6 ("Commerce . . . us[ed] Huarong's

transaction-specific margins from the eleventh administrative review to corroborate the AFA

rate.").

Based on its analysis of the 447 transactions, Commerce found that 47.88% was "well

within the range of the individual transaction margins observed for Huarong's sales of

bars/wedges during the eleventh administrative review."  Second Remand Results 6–7; Def.'s

Resp. 7 ("Commerce found that the 47.88 percent margin was probative and within the range of

the 447 individual transaction margins observed for Huarong's sales of bars/wedges.  Given this

range, Commerce determined that Huarong's transaction-specific rates from an administrative

review two years prior to the one at issue demonstrated that the 47.88 percent rate was grounded in

the company's 'commercial reality.'" (internal citation omitted)).  Although the rate falls toward

---

[8]     The Eleventh Administrative Review covered the POR from February 1, 2001 through January 31, 2002.  *See* HFHTs, Finished or Unfinished, With or Without Handles, From the PRC, 68 Fed. Reg. 53,347 (Dep't of Commerce Sept. 10, 2003) (final results of antidumping duty administrative review of the order on bars and wedges).  The Thirteen Administrative Review, at issue here, covers the POR from February 1, 2003 through January 30, 2004.  *See* Final Results, 70 Fed. Reg. at 54,897.

[9]     As noted, Commerce did not use transactions from this POR because of the agent sales scheme.

the high end of the range, when considering the volume of transactions, it is dramatically lower than the highest calculated rates for some individual transactions.[10]

In addition, the Department further corroborated the 47.88% AFA rate using a two-step process whereby it (1) determined a baseline rate, and (2) added a deterrence factor to encourage future compliance.  Using this method, the Department's first step was to determine a reasonable approximation of the rate Huarong would have received, had it cooperated, to use as the baseline. In doing so, Commerce considered the rationale, previously taken into account by this Court, that "a conservative estimate of what a non-cooperative respondent's margin would have been had it cooperated is the highest weighted-average margin calculated for that respondent in a prior review."[11]  Def.'s Resp. 6 (citing Second Remand Results 6; *Shandong Huarong*, 31 CIT at 47).

---

[10]        Specifically, relying on Huarong's own calculated transaction-specific rates from the Eleventh Administrative Review, the most recent review in which Huarong received such rates, Commerce found that these transactions spanned from -29.89% to 137.44%.  Mem. to File from Matthew Renkey regarding Business Proprietary Information Referenced in the Draft Results of Redetermination, A-570-803 (Mar. 31, 2011) (C.R. Doc. 4295).  Furthermore, "[o]ut of the 447 individual transactions, the 47.88 percent rate is lower than 112 (or 25.06 percent) of the margins, and higher than 335 (or 74.94 percent)."  *Id.*

[11]        Commerce further explains that

[f]ollowing the rationale upheld by the Court . . . , the Department finds that for non-cooperative respondents, a conservative estimate of what the respondent's margin would have been had it cooperated is the highest weighted-average margin calculated for that respondent in a prior review.  In this case, following that rationale, the Department expects that, at a minimum, Huarong would have received a dumping margin of 34.00 percent (its calculated rate from the sixth administrative review, 1996–1997), had it cooperated.  Given that its previous highest calculated rate was 34.00 percent, and following Congressional intent that a respondent should not benefit from an AFA rate *vis-à-vis* its previous calculated margins, Huarong's AFA margin for the thirteenth review would necessarily be higher than 34.00 percent.

( continued . . . )

Accordingly, Commerce used Huarong's highest previously-calculated rate of 34.00% from the

Sixth Administrative Review as a starting point.

Next, Commerce examined the effect of adding 13.88 percentage points to the baseline in

order to reach its selected AFA rate of 47.88%. In doing so, Commerce concluded that this amount

would be reasonable knowing that (1) 34.00% was a reasonable approximation of what Huarong's

rate would have been had it cooperated; and (2) that the 47.88% AFA rate had been approved for

Huarong by this Court after remand in the Ninth Administrative Review. *See Shandong Huarong*,

31 CIT at 48.

The court finds that Commerce has used facts and methodologies that sufficiently

corroborate the 47.88% rate. First, Commerce demonstrated that the AFA rate was within the

bounds of observed values from the Eleventh Administrative Review. In *KYD*, the Federal Circuit

noted that the "cases make clear that the dumping margin must be corroborated by 'secondary

information that has some grounding in commercial reality.'" *KYD, Inc. v. United States*, 607 F.3d

760, 770 (Fed. Cir. 2010) (quoting *Gallant Ocean*, 602 F.3d at 1324). Here, an examination of the

sales listed in Huarong's United States sales database confirms that the 47.88% rate is "within the

---

( . . . continued )

Second Remand Results 6. Commerce finds the referenced "Congressional intent" in the
Statement of Administrative Action accompanying the Uruguay Round Agreements Act, which
states

> [w]here a party has not cooperated, Commerce and the Commission may employ
> adverse inferences about the missing information to ensure that the party does not
> obtain a more favorable result by failing to cooperate than if it had cooperated fully.
> In employing adverse inferences, one factor the agencies will consider is the extent
> to which a party may benefit from its own lack of cooperation.

H.R. Doc. No. 103-316 at 870, *reprinted* in 1994 U.S.C.C.A.N. 4040, 4199 (1994).

range of the individual transaction margins observed for Huarong's sales of bars/wedges during

[this POR]."  Second Remand Results 6–7.  As such, it is evident that the rate is within the bounds

of sales that actually took place two years prior to the POR.  Although the selected rate was higher

than most individual transaction margins, it is well below others.  Here, it is certainly the case that

Commerce was justified in choosing a rate on the higher end in order to encourage future

compliance.  Further, Commerce's methodology confirms that the originally-assigned 139.31%

rate was aberrant.  *See De Cecco*, 216 F.3d at 1032 ("[T]he purpose of section 1677e(b) is to

provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or

uncorroborated margins.").

Second, Commerce's use of a two-step methodology, whereby it started with a 34.00%

baseline rate and applied a 13.88 percentage point deterrence factor, tends to further corroborate

the 47.88% AFA rate.  The Department determined the baseline rate in accordance with a

methodology reviewed by this Court in *Shandong Huarong*, wherein the Court approved an AFA

rate founded on a baseline that was the respondent's highest previously-calculated rate.  *Shandong

Huarong*, 31 CIT at 45 ("[T]he court finds that Commerce has explained adequately the reliability

and relevance of the [final] AFA rate . . . , and finds the method employed by Commerce in

reaching its conclusion [(i.e., using the respondent's highest previously-calculated rate as a

baseline)] reasonable.").  Thus, the court finds that Commerce's selection of the baseline  was

reasonable.

As to Commerce's decision to add 13.88 percentage points to the baseline rate, the court

also finds this reasonable.  As noted, the Federal Circuit has found that an AFA rate should be "a

reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase

intended as a deterrent to non-compliance."  *De Cecco*, 216 F.3d at 1032.  Here, the addition of the

13.88 points "as a deterrent to non-compliance" is reasonable for two reasons.  First, in the Ninth

Administrative Review, this increase was found to be a reasonable addition to the base rate, and

amounted to an AFA rate of 47.88% for Huarong's sales of bars/wedges.  *See Shandong Huarong*,

31 CIT at 48 ("[I]t is not unreasonable for Commerce to allot to Huarong an approximate

thirteen-percentage-point increase from its highest calculated rate of 34.00 percent as a

deterrent.").  Second, when added to the baseline of 34.00%, it yields the 47.88% rate, which, as

has been seen, is within the range of Huarong's actual transaction-specific rates in the Eleventh

Administrative Review, and was also the rate assigned to Huarong's sales of bars/wedges during

the Ninth Administrative Review.

    As a result, Commerce's methodology in this case resulted in an AFA rate that is "both

reliable and bear[s] a rational relationship to the respondent."  *Shandong Huarong*, 31 CIT at 46.

Therefore, the court finds that Commerce employed a method that was reasonable and not contrary

to law, in this case, because "[h]ere, the reasoning of Commerce's methodology is clear and

simple."  *Qingdao Taifa*, 35 CIT at __, 780 F. Supp. 2d at 1350 ("When making a discretionary

determination [such as determining an AFA rate], . . . Commerce can use a case-by-case analysis,

so long as it is 'consistent with its statutory authority.'  Under such circumstances, Commerce is

not required to justify its determinations in terms of past alternatives.  Of course, Commerce must

always act reasonably." (quoting *Allied-Signal Aerospace Co. v. United States*, 28 F.3d 1188, 1191

(Fed. Cir. 1994) (internal citations omitted))).  In addition, as has been seen, the rate is supported

by substantial evidence.

    For these reasons, the court sustains Commerce's selection of the AFA rate of 47.88% for

Huarong's sales of bars/wedges.

IV.    Corroboration of the AFA Rate for TMC's Sales of Picks/Mattocks

The court now turns to the AFA rate determined for TMC's sales of picks/mattocks.

Pursuant to the court's instructions, on remand, Commerce reassessed its original 98.77% AFA

rate and assigned an AFA rate of 32.15% for TMC's sales of picks/mattocks.

Plaintiffs argue that TMC's AFA rate was not corroborated by Commerce because it does

not reflect TMC's commercial reality.  Pls.' Cmts. 9.  Despite plaintiffs' arguments, the court finds

that Commerce has sufficiently corroborated the selected rate.  First, the AFA rate of 32.15% was

reliable because it was based on TMC's own data.  Def.'s Resp. 12 ("[T]he 32.15 percent rate was

calculated using TMC's most recent experience and data because the eight sales observations used

in the calculation were from TMC's sales from the most recent prior review.").

In addition, Commerce has sufficiently corroborated the rate and adequately demonstrated

that it reflected TMC's commercial reality during the POR.  In doing so, the Department looked at

TMC's transactions during the immediately-preceding Twelfth Administrative Review and found

that "there were a total of 74 TMC U.S. sales transactions . . . . Of those 74 TMC transactions, eight

had margins above *de minimis* (greater than 0.5 percent)."  Second Remand Results 7 n.3.  The rate

of 32.15% was derived from a weighted-average margin calculated from these eight dumped

transactions.  *See* Second Remand Results 8; *see also* Def.-Int.'s Reply to Cmts. on Final Results

of Redetermination 10 (ECF Docket No. 151) ("The respondent's own data, adjusted to remove a

favorable factor, such as the existence of non-dumped sales, provides [a] deterrent, without

sacrificing relevance to the respondent or departing from commercial reality.").  This calculation

resulted in the AFA rate of 32.15%.

While basing the deterrence increase on eight out of seventy-four transactions may not

appear to be representative of TMC's total sales, and thus its commercial reality, Commerce found

that "[t]hese eight transactions represent a significant percentage of the volume and value sold by

TMC during the previous administrative review."  Second Remand Results 8.  The Department

demonstrated its volume contention with "a precise explanation of the number of CONNUMS[12]

covered by these eight transactions, as well as their volume and value."  Second Remand Results 8;

*id.* at 12 ("This [32.15%] rate is corroborated because it is based on a significant quantity and value

of sales from the twelfth administrative review, covering half of all CONNUMS sold during that

period.").  Specifically, Commerce examined the number of CONNUMS that were covered by the

eight dumped transactions used to calculate the 32.15% rate, and found that these eight

transactions included half of the CONNUMS (or unique products) sold during that POR.  In other

words, of all the merchandise involved in TMC's transactions during the Twelfth Administrative

Review, as classified in Commerce's product-type hierarchy, more than half of the products were

part of these eight transactions.  Thus, because the eight transactions comprised a significant

percentage of TMC's sales activity, and because the increase was based on the weighted average

of these transactions, Commerce has demonstrated that the AFA rate reflects TMC's commercial

reality.

     Next, Commerce further corroborated the AFA rate of 32.15%, derived from TMC's eight

---

     [12]     A CONNUM

     "is a contraction of the term 'control number,' and is simply Commerce jargon for a
unique product (defined in terms of a hierarchy of specified physical characteristics
determined in each antidumping proceeding).  All products whose product
hierarchy characteristics are identical are deemed to be part of the same CONNUM
and are regarded as 'identical' merchandise for purposes of the price comparison."

*Union Steel & Dongbu Steel v. United States*, 36 CIT __, __, 823 F. Supp. 2d 1346, 1349
(2012) (citation omitted).

dumped transactions in the most recent review, by comparing the rate to those assigned to other

participants in the same review. In doing so, "Commerce determined that the 32.15[%] AFA rate

fell within the range of margins determined for other market players, which ranged from zero to

98.77."[13] Def.'s Resp. 13. In other words, Commerce established that the rate it calculated was

relevant because it was within the spectrum of margins determined for other market participants in

the same review. *See* Second Remand Results 8.

Finally, the Department corroborated the 32.15% AFA rate using the same two-step

process it used for Huarong's sales of bars/wedges, whereby it (1) determined a baseline rate, and

(2) added an amount to encourage future compliance. *See De Cecco*, 216 F.3d at 1032 (An AFA

rate is "a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in

increase intended as a deterrent to non-compliance."). For TMC, Commerce used the calculated

rate of 4.61% from a prior review as a baseline,[14] which was increased by 27.54 percentage points

to arrive at 32.15%. The baseline rate of 4.61% was TMC's highest previously-calculated rate,

and was from the Twelfth Administrative Review, the review directly preceding the one at issue.

Although the increase of 27.54 percentage points might appear large when compared to the

baseline rate, Commerce has demonstrated that it is reasonable.

---

[13]    Commerce's review included 194 PRC companies during the Thirteenth
Administrative Review of the four antidumping duty orders covering HFHTs, not all of which sold
HFHTs that fell within the scope of the "pick/mattocks" order. The highest rate calculated for any
respondent for sales of picks/mattocks during this review was 98.77%, which was then used as the
PRC-wide rate for picks/mattocks. *See* Final Results, 70 Fed. Reg. at 54,899.

[14]    Plaintiffs do not challenge the selection of the previously-calculated rate of 4.61%
from the Twelfth Administrative Review as TMC's baseline rate. Pls.' Cmts. 9 ("We do not
challenge Commerce's selection of the 4.61 percent calculated rate for TMC."). Therefore, the
court need not evaluate this baseline rate.

"By requiring corroboration of adverse inference rates, Congress clearly intended that such rates should be reasonable and have some basis in reality." *De Cecco*, 216 F.3d at 1034.  Here, as discussed, the deterrence increase was derived from TMC's own complete dataset from the same review that produced the 4.61% rate.  Specifically, Commerce recalculated the rate with a weighted-average margin using only the eight data points from the Twelfth Administrative Review that reflected dumped transactions, which resulted in the final 32.15% AFA rate.  Being based on TMC's own data from the most recent review, the AFA rate is both reliable and relevant to TMC.  *See* Second Remand Results 12 ("[T]he 32.15 percent rate bears a clear relationship to TMC.").  Therefore, Commerce's two-step methodology in this case resulted in an AFA rate that is "both reliable and bear[s] a rational relationship to the respondent." *Shandong Huarong*, 31 CIT at 46.

Thus, the court finds that Commerce has adequately explained the reliability and relevance of the AFA rate with respect to TMC's sales of picks/mattocks, as well as its relationship to TMC's commercial reality, therefore meeting the corroboration requirement.  Specifically, Commerce corroborated the AFA rate of 32.15% by (1) relying upon TMC's own data; (2) explaining how the AFA rate reflected TMC's commercial reality because the eight transactions it relied upon to calculate the AFA rate comprised a significant percentage of TMC's sales activity; and (3) comparing this rate to those assigned to other participants in the same review, and finding that it fell within the range of margins determined for other market players.  This corroboration also demonstrates that the rate was not aberrational because it was aligned with the margins determined for other market participants in the same review.  This methodology also further demonstrates that the originally-assigned rate of 98.77% was aberrant. *See De Cecco*, 216 F.3d at 1032 ("[T]he purpose of section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose

punitive, aberrational, or uncorroborated margins.").

For these reasons, the court sustains Commerce's selection of the AFA rate of 32.15% for

TMC's sales of bars/wedges as being in accordance with law and supported by substantial

evidence.


V.      Plaintiffs' Zeroing Methodology Argument

Plaintiffs further assert that the calculated rates used as the baselines for Huarong and TMC

were calculated using Commerce's zeroing methodology, an approach plaintiffs claim was called

into question by *Dongbu Steel Co. v. United States*, 635 F.3d 1363 (Fed. Cir. 2011).  Plaintiffs

argue that "[a]ny calculated rate [from a previous review] that incorporates Commerce's zeroing

methodology already includes a 'built-in increase to deter non-compliance' since by zeroing sales

with negative margins, Commerce is adding a deterrent factor."  Pls.' Cmts. 11.  For this reason,

plaintiffs argue for the use of the highest previously-calculated rates, 34.00% for Huarong and

4.61% for TMC, without any increase because these previous rates, having been calculated with

the zeroing methodology, already include a "built-in deterrence factor."  Pls.' Cmts. 12.

The court finds plaintiffs' arguments unpersuasive.  First, Commerce's decision to depart

from its use of zeroing in antidumping investigations was the result of an effort to comply with the

Recommendations of the World Trade Organization Dispute Settlement Body.  *See* Antidumping

Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping

Investigation, 71 Fed. Reg. 77,722 (Dep't of Commerce Dec. 27, 2006) ("Final Modification").

Thus, the change was not directed by any U.S. court as being required by U.S. law, but rather was

an effort by Commerce to comply with this country's treaty obligations.  *See Dongbu Steel*, 635

F.3d at 1365 ("Commerce . . . decided to stop using zeroing in investigations to comply with

international treaty obligations while continuing to use it in administrative reviews.").  Indeed,

prior to Commerce's decision to change its methodologies, the use of zeroing had been approved

by courts many times.  *See, e.g., Corus Stall BV v. Dep't of Commerce*, 395 F.3d 1343, 1347, 1349

(Fed. Cir. 2005); *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (The statute

"allow[s] for Commerce's construction . . . [and zeroing] makes practical sense.").  In addition,

Commerce announced this change in December 2006.  *See* Final Modification, 71 Fed. Reg. at

77,722.  Therefore, the decision to cease using zeroing in investigations occurred after the review

at issue in this case, which covers the POR from 2003 through 2004.

Next, while Commerce ended its use of zeroing in the context of investigations, neither the

Federal Circuit nor this Court have found zeroing to be unlawful in the context of antidumping

reviews, such as the one at issue in this case.  To the contrary, both the Federal Circuit and this

Court have approved the use of zeroing in antidumping reviews.  *See, e.g., SKF USA Inc. v. United*

*States*, 630 F.3d 1365, 1375 (Fed. Cir. 2011) ("Commerce changed its practice for original

investigations and no longer uses zeroing for calculation of weighted average dumping margins,

but it continues to use zeroing during administrative reviews. . . . Commerce's application of

zeroing to administrative reviews is not inconsistent with the statute." (citations omitted)); *U.S.*

*Steel Corp. v. United States*, 621 F.3d 1351, 1361 (Fed. Cir. 2010) (The antidumping duty statute

"does not unambiguously preclude—or require—Commerce to use zeroing methodology.");

*Union Steel & Dongbu Steel v. United States*, 36 CIT __, __, 823 F. Supp. 2d 1346, 1350–52

(2012) (citation omitted) (providing a complete background to the use of zeroing in administrative

reviews and listing judicial precedents approving of such use).

Furthermore, any dispute in U.S. courts over Commerce's zeroing methodology has

extended only to the issue of the reasonableness of Commerce's use of zeroing in one situation

(i.e., antidumping reviews) and not in the other (i.e., antidumping investigations).  *See JTEKT*

*Corp. v. United States*, 642 F.3d 1378, 1385 (Fed. Cir. 2011) ("Commerce must explain why these

(or other) differences between the two phases make it reasonable to continue zeroing in one phase,

but not the other."); *Dongbu Steel*, 635 F.3d 1363; *Union Steel*, 36 CIT __, __, 823 F. Supp. 2d at

1360 ("Commerce acted reasonably in applying the antidumping statute to conform to the different

purposes of investigations and reviews.").

     Finally, before and after the POR, both this Court and the Federal Circuit have approved

antidumping margins calculated in reviews where zeroing was employed.  *See, e.g.*, *NSK Ltd. v.*

*United States*, 510 F.3d 1375, 1378 (Fed. Cir. 2007) (upholding antidumping margins calculated

using zeroing); *Timken*, 354 F.3d 1334, 1342 (upholding antidumping margins calculated using

zeroing).  Indeed, had Huarong chosen to fully cooperate in this review, it would also have

received a rate calculated in accordance with the zeroing methodology.

     Hence, because (1) the POR was prior to Commerce's change in its use of the zeroing

methodology for investigations, (2) no Court has invalidated the use of zeroing in administrative

reviews, and (3) the Court has regularly approved antidumping margins calculated using zeroing,

plaintiffs' arguments based upon the zeroing methodology are rejected.

## CONCLUSION AND ORDER

For the foregoing reasons, the court concludes that Commerce's determination of AFA

rates for Huarong and TMC is supported by substantial evidence and otherwise in accordance with

law.  Thus, it is hereby

ORDERED that the Final Results of Redetermination are SUSTAINED.


                                                    _____/s/ Richard K. Eaton_____
                                                              Richard K. Eaton

Dated:          June 14, 2012
                New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

_____

| | : | |
|---|---|---|
| TIANJIN MACHINERY IMPORT & | : | |
| EXPORT CORP. and SHANDONG | : | |
| HUARONG MACHINERY CO., LTD., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Before:       Richard K. Eaton, Judge |
| | : | |
| UNITED STATES, | : | Court No. 05-00522 |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| AMES TRUE TEMPER, | : | |
| | : | |
| Defendant-Intervenor. | : | |

_____ :

## JUDGMENT

Upon consideration of the papers and proceedings had herein, and in conformity with the court's decision in this matter, it is hereby

ORDERED that the Remand Results are sustained.   Accordingly, this case is dismissed.


    /s/ Richard K. Eaton    
                      Richard K. Eaton


Dated:       June 14, 2012
             New York, New York